UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SHAUNA DEE TAYLOR,

      Petitioner,

v.

      Case No. 3:23-cv-194-HES-SJH

RICKY D. DIXON, SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

      Respondent.

---

## **ORDER**

### **I. Status**

Petitioner Shauna Dee Taylor, <u>pro se</u>, a Florida state prisoner, initiated this action by filing a 56-page Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1, Petition).[1] Taylor challenges a state court (Duval County, Florida) conviction for aggravated child abuse and child neglect, raising 15 enumerated grounds for relief. Respondent, on behalf of the State of Florida, submitted a 73-page memorandum in opposition to the Petition (Doc. 8, Response), as well as voluminous exhibits from the state court record. (<u>See</u> Response at 72-73, Docs. 8-1 through 8-13). Taylor filed a brief in reply. (Doc. 10, Reply). This action is ripe for review.

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

## II. Procedural History

In December 2015, the State of Florida filed a two-count information against Taylor, charging her with aggravated child abuse in violation of Fla. Stat. § 827.03(1)(a) (Doc. 8-1 at 58, Count One) and child neglect in violation Fla. Stat. §§ 827.03(1)(e) and (2)(b) (id., Count Two), occurring on or between February 11, 2013, and April 3, 2013. Both counts arose out of allegations that Taylor has factitious disorder, not otherwise specified (NOS), previously known as Munchausen syndrome by proxy, "a psychological disorder in which a person fabricates symptoms of illness in her child for the purpose of gaining the attention of medical personnel." Storck v. City of Coral Springs, 354 F.3d 1307, 1309 (11th Cir. 2003); see also Shauna T. v. Ariz. Dep't of Economic Sec., 2012 WL 1861409 (Ariz. Ct. App. Div. 1, Dep't A, May 22, 2012); Shauna T. v. Ariz. Dep't of Economic Sec., 2011 WL 743072 (Ariz. Ct. App. Div. 1, Dep't C, Mar. 3, 2011); In re Austynn F., 2004 WL 2713326, at *1 (Cal. Ct. App. 4th Dist., Div. 3, Nov. 30, 2004); In re William F., 2001 WL 1660075, at *2 (Cal. Ct. App., 4th Dist., Div. 3, Dec. 28, 2001). Specifically, the State claimed that Taylor poisoned her then-four-month-old infant daughter, R.T., with iron drop supplements; took her to Wolfson Children's Hospital in Jacksonville, in Duval

2

County; and gave false medical history for R.T., causing R.T. to endure pain and suffering, including from unnecessary medical tests and interventions.

Taylor had a two-day trial on August 28 and 29, 2018. (Doc. 8-2 at 215-602). The jury found her guilty on both counts. (Doc. 8-1 at 117-18; Doc. 8-2 at 595-96;). The state trial court sentenced her to 12 years imprisonment on each, to run concurrently, followed by 15 years probation. (Doc. 8-1 at 121-27, 249-54; Doc. 8-3 at 6-8). Taylor filed a direct appeal. (See Doc. 8-5). On April 6, 2020, the Florida First District Court of Appeal (First DCA) affirmed in a per curiam order without a reasoned opinion. (Doc. 8-8); Taylor v. State, 292 So. 3d 1156 (table) (Fla. 1st DCA 2020).

Meanwhile, on June 10, 2019, Taylor's appellate counsel had also filed a motion in the trial court seeking to correct a sentencing error under Rule 3.800(b)(2), Fla. R. Crim. P. (Doc. 8-4 at 5-10). She argued that the state trial court's determination at sentencing that R.T.'s injuries were "severe" for purposes of her sentencing score was not supported by the evidence or the jury's verdict. (Id.) The trial court denied that motion on the merits on August 6, 2019. (Id. at 11-13). Taylor did not appeal from that order.

On April 5, 2021, Taylor filed a pro se motion for postconviction relief in the state trial court pursuant to Rule 3.850, Fla. R. Crim. P. (Doc. 8-9 at 5-18).

3

She thereafter filed an amended motion. (Id. at 31-46). On July 1, 2022, the trial court issued a 16-page order summarily denying all claims without an evidentiary hearing. (Id. at 50-65; Petition at 58-73). Taylor appealed. (See Doc. 8-10). On January 31, 2023, the Florida Fifth District Court of Appeal (Fifth DCA) affirmed by per curiam order without a reasoned opinion. (Doc. 8-12 at 2; Petition at 57); Taylor v. State, 355 So. 3d 414 (table) (Fla. 5th DCA 2023). The mandate issued February 23, 2023. (Doc. 8-12 at 3).

Taylor filed this pro se federal habeas action on February 20, 2023.[2] (Petition). She asserts 15 enumerated grounds for relief, summarized as follows:

> **Ground One**: Counsel was ineffective for failing to call various experts and other witnesses (Petition at 6-11);
>
> **Ground Two**: Counsel was ineffective for failing to properly investigate Taylor's case and for pressuring her not to testify (id. at 12);
>
> **Ground Three**: Counsel was ineffective for failing to have Taylor evaluated by a psychological expert and to present favorable mental health records to the jury (id. at 13-14);
>
> **Ground Four**: Counsel was ineffective for failing to object to the State's production of only partial, rather than complete, medical

---

[2] The Court applies the "prison mailbox rule" in determining the date of filing for the Petition. See Houston v. Lack, 487 U.S. 266, 275-76 (1988). The State acknowledges that Taylor filed the Petition within the one-year statute of 28 U.S.C. § 2244(d). (See Response at 5).

records or R.T.; failure to obtain such complete records; and that the State violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) by withholding R.T.'s full medical records (<u>id.</u> at 16-17);

**Ground Five**: The State violated <u>Brady</u> by withholding R.T.'s medical records (Petition at 19);

**Ground Six**: Counsel was ineffective for failing to object to or otherwise properly contest "<u>Williams</u>[3] Rule" evidence of prior bad acts, and the trial court improperly admitted such evidence at trial (<u>id.</u> at 21-22);

**Ground Seven**: Counsel was ineffective for failing "to present an actual claim of innocence," to show that the State's case was legally insufficient, to subject the State's case to "meaningful adversarial testing" (<u>id.</u> at 24-25);

**Ground Eight**: Counsel was ineffective for failing to file a motion to dismiss (<u>id.</u> at 27-28);

**Ground Nine**: Counsel was ineffective for failing to object to testimony by a psychological expert witness for the State, Dr. Deborah Day (Petition at 29-30);

**Ground Ten**: Counsel was ineffective for failing to obtain records and witness testimony from representatives of the Food and Drug Administration (FDA) and Baxter International (Baxter), the manufacturer of Buminate, the brand name of an albumin blood protein solution given to R.T. in the hospital, to support that such product[4] could have caused her elevated iron level (Petition at 31);

**Ground Eleven**: Counsel was ineffective at sentencing for failing properly to argue against the State's claim that R.T.'s injury

---

[3] <u>Williams v. State</u>, 110 So. 2d 654 (Fla. 1959).

[4] Because the parties and the state trial court appear to have used the terms "Buminate" and "albumin" interchangeably, this Court will do likewise.

should be increased from "great" to "severe" bodily injury, which added 40 points to Taylor's sentencing score (id. at 33-34);

**Ground Twelve**: Counsel was ineffective for failing to contest venue (id. at 36-38);

**Ground Thirteen**: The trial court improperly admitted Williams Rule evidence of other bad acts and trial counsel was ineffective in failing to object to such evidence (id. at 40-43);

**Ground Fourteen**: The trial court improperly imposed "a "vindictive sentence and … sex offender probation" (id. at 45-46); and

**Ground Fifteen**: The trial court erred by improperly admitting testimony from four State witnesses who testified based on their review of medical, mental health, and government agency records (Petition at 48-51).

The State filed a response, opposing all relief and attaching exhibits from the state court record. (Response). Taylor filed a Reply. It includes a brief composed of unsworn, unverified allegations and arguments. (Reply at 1-10). It also attaches three numbered exhibits (Reply at 11-18), which represent the only evidence that Taylor has submitted to this Court in support of her claims, other than allegations of her Petition, which she has verified pursuant to 28 U.S.C. § 1746. (See Petition at 56).

On March 1, 2023, approximately a week after filing this habeas action, Taylor filed a second Rule 3.800, Fla. R. Crim. P., motion in the state trial court. (Doc. 8-13). She filed that motion pro se, citing Rule 3.800(a), arguing

6

that the state trial court unlawfully and in violation of the Constitution imposed "special conditions of probation" that "equate[] to sex offender probation." (Id. at 6-7). According to the State, that motion remained pending as of November 2023 (Response at 5), but the parties have not updated the Court of the status of the motion since.

Nevertheless, viewing publicly available online court records,[5] of which the Court takes judicial notice, see Paez v. Sec'y, Fla. Dep't of Corr., 947 F.3d 649, 651-53 (11th Cir. 2020), the Court has determined the following: On August 26, 2024, Taylor filed an amended Rule 3.800(a) motion, which added a claim alleging that her sentence was "vindictive." On September 4, 2024, the trial court summarily denied the motion in a six-page order, concluding that neither of Taylor's claims was cognizable under Rule 3.800(a). Taylor appealed, but the Fifth DCA affirmed in a per curiam order without a reasoned opinion on April 8, 2025. Taylor v. State, 408 So. 3d 117 (table) (Fla. 5th DCA 2025).

### III. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to

---

[5] See https://core.duvalclerk.com/CoreCms.aspx?mode=PublicAccess.

grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318–19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Paris's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## IV. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme

8

malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Id. (internal quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 584 U.S. 122, 125 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as

9

persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 125-26.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97–98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.
>
> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable

10

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. [12, 18] (2013); accord Brumfield v. Cain, 576 U.S. [305, 322] (2015)]. Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at [18] (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were

11

adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme

12

court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365–366; O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman [v. Thompson, 501 U.S. 722, 747-48 (1991); [Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977)]. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. 307, 316 (2011); Beard v. Kindler, 558 U.S. 53, 60-61 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause

13

> for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting [Murray v. Carrier, 477 U.S. 478, 488 (1986). Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

14

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby

15

prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (first citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003); and then <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [<u>Strickland</u>,] 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. <u>Id.</u>, at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u>, at 687.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>, at 687.

<u>Richter</u>, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward</u>, 592 F.3d at 1163. Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an

16

ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at 105. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014); Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference—this one to a state court's decision—when we are considering whether to grant federal habeas relief from a state court's decision." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004). As such,

17

"[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## V. Findings of Fact and Conclusions of Law

Taylor previously asserted most of, but not all, her claims for habeas relief as grounds in her amended Rule 3.850 motion (hereinafter the "Rule 3.850 motion"). In rejecting the claims she did present, the state trial court discussed them in groups, based upon the relatedness of their supporting allegations and legal theories. This Court will do likewise, although the claims are not grouped entirely as the state trial court did. The Court will first consider Taylor's multiple claims alleging ineffective assistance of trial counsel. The Court will then turn to her <u>Brady</u> claim. And finally, the Court will address Taylor's claims contesting rulings of the state trial court.

### A. Ineffective Assistance of Counsel

#### 1. Failure to Investigate and to Present Evidence, Experts, and Other Witnesses (Included in Grounds One, Two, Three, Four, Seven, and Ten)

Ground Two raises a generalized claim of ineffective assistance of trial counsel asserting that Taylor supplied "information for numerous witnesses and serious evidence," but counsel "failed to perform a pre-trial investigation." (Petition at 12). Ground Seven similarly contends broadly that counsel was

18

ineffective for "failing to present an actual claim of innocence" and "meaningful adversarial testing" of the State's case. (Id. at 24-25). Grounds One, Three, Four, and Ten raise more specific claims that counsel was ineffective for failing to investigate and present testimony and documentary evidence through numerous experts and other witnesses, as follows:

(1)    an unnamed hematologist, to testify about how R.T.'s blood iron increase could have been caused by the administration by hospital staff of Buminate (Petition at 7, Ground One);

(2)    Florida Department of Children and Families (DCF) attorney Douglas Massey, who could have testified to "photographic evidence that was dated and time stamped and in his possession proving that at no time was [R.T.] injured or neglected" (id., Ground One);

(3)    Dr. David McPhee, a psychologist in Mesa, Arizona, who evaluated Taylor and issued a report stating that she "did not suffer from factitious disorder NOS and was not a threat to her children" (id., Ground One);

(4)    Dr. Jack Potts, a forensic psychiatrist in Pheonix, Arizona, who also evaluated Taylor and issued a report "denying the existence of factitious disorder NOS" and stating that Taylor "isn't a risk to any child and is safe to parent" (id. at 7-8, Ground One);

(5)    Carol Cole, a licensed clinical social worker, of Carol Cole Centers in Huntington Beach, California, who, according to Taylor, "issued numerous reports as to [her] positive parenting" (Petition at 8, Ground One);

(6)    unspecified personnel from Child Crisis Center in Mesa who supervised visitation between Taylor and her children and

19

issued reports "as to [Taylor's] positive and appropriate parenting" (id., Ground One);

(7)     Becky Eilers, a social worker, in Missouri Valley, Iowa, who provided "hundreds of hours of therapy" to Taylor and issued reports that Taylor is an "appropriate parent and no risk to her children" (id., Ground One);

(8)     Ron Berube, a counselor in Council Bluffs, Iowa, who provided therapy to Taylor and her children and issued reports "as to [Taylor's] bonding, positive parenting [and] her being a safe parent" (id., Ground One);

(9)     Dr. Nezhat Edelation McCain, a psychologist in Mesa who also provided therapy to Taylor and issued reports "as to [her] mental state" and that she "posed no risk to her children" (id. at 8-9, Ground One);

(10)    unnamed "Doctors, Nurses, Nurse Practitioners, Therapists, and Social Workers" in the NICU [neonatal intensive care unit] at Baptist Hospital in Jacksonville, Florida, where R.T. was treated, to testify that Taylor was "a good, appropriate, effective parent that saw to all of [R.T.]'s needs … and that [Taylor] was no threat to [R.T.] (Petition at 9, Ground One);

(11)    unnamed staff from All About Pediatrics Home Health Center in Jacksonville, who also treated R.T., to testify that the three times when Taylor brought R.T. to the Emergency Room, it was "by direct order of the Home Health Nurse due to [R.T.]'s apnea monitor downloads and appearance" (id. at 9-10, Ground One)

(12)    Erica Garcia, a DCF case worker from Starke, Florida, who, according to Taylor, could have testified, after R.T. was removed from Taylor's care, she "was always crying, agitated, and never slept" and was "always sick," requiring up to four doctor's visits per week (id. at 10, Ground One);

20

(13)  an unnamed, retained "psychological expert" to evaluate Taylor and testify that she does not suffer from factitious disorder (id. at 13-14, Ground Three);

(14)  additional medical records from R.T.'s treatment at Wolfson Children's Hospital (id. at 16-17, Ground Four); and

(15)  FDA records and reports and witness testimony from one or more unnamed employees or officials of Baxter the manufacturer of Buminate, to testify that it could have caused R.T. elevated iron levels (id. at 31, Ground Ten).

Taylor contends that had counsel investigated and presented the above witnesses and evidence, it would have shown that she did not poison R.T. with iron supplements and that R.T.'s liver failure and the dangerous increase in her iron levels were instead caused by Buminate administered in the hospital. As a result, Taylor contends, there is a reasonable probability the jury would have acquitted her.

Taylor raised these claims in her Rule 3.850 motion. (See Doc. 8-9 at 34-44, Grounds One, Two, Three, Four, Five, Six, Nine, Ten, Fourteen, and Fifteen). The state trial court rejected them without an evidentiary hearing. (Doc. 8-9 at 52-57). The trial court did so on two alternative grounds, as further explained below.

First, the trial court held, that Taylor was "prohibited from raising these claims" because "she made sworn statements indicating her satisfaction with

21

counsel and his investigation of the case, and affirmed she did not know of any witnesses or evidence she wished for counsel to present." (Id. at 52). Quoting Kelley v. State, 109 So. 3d 811, 812-13 (Fla. 1st DCA 2013), the trial court recognized, "A Rule 3.850 motion cannot be used to go behind representations the defendant made to the trial court, and the court may summarily deny post-conviction claims that are refuted by such representations." (Doc. 8-9 at 52). The court then referenced two colloquies it had with Taylor. (Id. at 52-53). The first came at a pretrial hearing. (Id. at 52-53; Doc. 8-1 at 267-269). There Taylor's counsel had advised the court that he had consulted with "close to a half dozen" experts "to review the case" but had ultimately decided against calling any of them, after discussing the matter with Taylor. (Doc. 8-1 at 263-64). Taylor was then put under oath, whereupon she did not contradict counsel's account. To the contrary, she acknowledged to the trial court (1) that she had been able to discuss the evidence, charges, and consulting experts' opinions with defense counsel, (2) her understanding that her counsel did not plan to call any witnesses at trial, (3) that there were none she felt should be called, (4) that she did not feel her counsel needed to do any additional investigation to prepare for trial, (5) that she was "absolutely" satisfied with

22

her counsel's performance, and (6) that counsel had answered all of her questions to her satisfaction. (Id. at 267-269).

The other referenced colloquy was after the close of the State's case at trial. (Doc. 8-2 at 503-07). Taylor similarly acknowledged under oath (1) that she was aware that defense counsel was not going to present any witnesses or evidence on her behalf; (2) that she was not aware of, and had not asked her attorneys to present, any other witnesses or evidence; (3) that she was satisfied with her counsel's performance; and (4) could not identify anything else she wanted counsel to do. (Id.) In rejecting Taylor's multiple claims in her Rule 3.850 motion complaining to the contrary, the trial court again cited Kelley and stated that Taylor could not "go behind her prior sworn statements" and "now claim[] she informed counsel of all witnesses and evidence she wanted presented and even begged counsel to investigate." (Doc. 8-9 at 54). The trial court asserted that Taylor "should have, when given the opportunities, made the court aware of counsel's failures during her multiple colloquies. Instead, she affirmatively stated she had no additional witnesses or evidence to present, and therefore waived her right to make these allegations." (Id.) The trial court then cited Terrell v. State, 9 So. 3d 1284, 1289 (Fla. 4th DCA 2009), characterizing that decision as recognizing that a "defendant's sworn answers

23

during a colloquy indicating that he or she did not wish his attorney to call a witness where the defendant was aware of the witness and the substance of his or her testimony at the time of the colloquy." (Doc. 8-9 at 54). "In summation," the trial court stated, "by confirming her satisfaction with counsel's investigation and affirmatively stating that she had no other witnesses or testimony to present during her colloquies, Defendant has now waived her ability to make these claims of ineffective assistance of counsel for failure to investigate, call lay witnesses, and call expert witnesses." (Id. at 57).

Alternatively, the state trial court held that, even if "not precluded" by Taylor's colloquies, these claims "lack merit" because Taylor could not establish prejudice under Strickland. (Doc. 8-9 at 54-57). The trial court explained:

> [C]ounsel did present a defense by arguing no direct evidence existed of Defendant poisoning [R.T.] [Doc. 8-2 at 540, 544-45][6] Counsel elicited through cross-examination that the victim had similarly suffered from liver dysfunction when she was first born and in the NICU, and had also been given Albumin, Human (Buminate) then, insinuating that the Albumin had caused the high liver counts as opposed to Defendant herself. [Doc. 8-2 at 407]. Counsel's theory of defense was that the medical professionals had since learned of Defendant's history with [redacted] factitious disorder and immediately decided that she was guilty of poisoning [R.T.] without any proof. [Doc. 8-2 at 550]. Throughout the cross-examination of the State's witnesses and during closing argument,

---

[6] In quoting the trial court's order, the Court has substituted the trial court's citations to the state court record with citations to the same pages where they appear in this Court's electronic filing system.

24

counsel pointed out that Defendant had brought to the emergency room for valid concerns, and noted that the medical professionals contradicted one another a number of times. [Doc. 8-2 at 353-54, 359, 398-99, 406, 552, 554-58]. Though the defense was not successful, counsel nevertheless did present one. Counsel cannot be ineffective for failing to do something counsel actually did. See Turner v. State, 91 So. 3d 916, 918 (Fla. 2d DCA 2012). Likewise, counsel cannot be deemed ineffective simply for not succeeding at trial.

Further, Defendant cannot prove prejudice, resulting from the lack of witnesses and/or evidence offered in her defense. Defendant's claim revolves around her theory that the Albumin, Human (Buminate) given to the victim by hospital employees caused the victim's extremely elevated iron levels. However, counsel cross-examined the State's expert witnesses on the effects of Albumin, and all who were questioned on this line of inquiry stated that the child received Albumin to support her liver's functioning after her iron numbers had risen to a concerning level, not before. [Doc. 8-2 at 329-32, 365-66, 463-64]. The witnesses testified that Albumin supports liver function and would neither increase iron numbers nor cause an inflated iron reading. [Doc. 8-2 at 407-09, 336, 463-64]. Further, nurse practitioner Sandra Shapiro stated that a hospital would never give Albumin to a child with high iron levels if Albumin did, in fact, cause elevated iron levels. [Doc. 8-2 at 410-11].

As such, any evidence that Albumin could cause, increased iron levels would not have changed the outcome in Defendant's case, where the victim was given Albumin only after her iron numbers had already increased to a concerning level. Counsel cannot be deemed ineffective for failing to present a meritless defense. See Lukehart v. State, 70 So. 3d 503, 512 (Fla. 2011) (quoting Schoenwetter v. State, 45 So. 3d 535, 546 (Fla. 2010)).

Defendant contends some of the witnesses noted above would have testified Defendant [redacted] this testimony would have led to an acquittal. Defendant has failed to prove prejudice because such

25

evidence would have been cumulative to the evidence presented. See Nelson v. State, 73 So. 3d 77, 89 (Fla. 2011) ("[E]ven if a witness was available to testify and counsel was deficient in not presenting his or her testimony during trial, counsel is not ineffective if that testimony would have been cumulative to other evidence presented, because such cumulative evidence removes a defendant's ability to establish prejudice."). Testimony was presented during the trial that Defendant, on the numerous times she presented at the emergency room with the victim, was very appropriate and very concerned about [R.T.] [Doc. 8-2 at 312-14, 317, 322, 355]. In fact, toxicology tests were not immediately conducted on the victim because [Defendant] appeared so trustworthy: "We had no concerns about that. [Defendant] had been at the bedside the whole time, she had been very involved in the patient's care." [Doc. 8-2 at 332].

Further, testimony that Defendant appeared to truly care for the child and support her would not have led to an acquittal for Defendant where such behavior is not uncommon in those diagnosed with Munchausen Syndrome by proxy; those caregivers appear engaged and caring, but actually embellish or create illnesses within [redacted] children in order to meet their own emotional needs, while, at the same time, harming [redacted] children, [Doc. 8-2 at 278-81, 448-49]. That Defendant appeared to be caring and loving does not contradict her diagnosis of Munchausen Syndrome by proxy, and would not have led to an acquittal.

Finally, Defendant contends some of the witnesses would have testified the victim's illnesses did not stop even after she was taken away from Defendant. Defendant reasons if the victim continued to be ill and require doctors' visits after being taken from Defendant, Defendant could not have been the one to cause the victim's illness. However, Defendant cannot prove prejudice from the lack of witnesses testifying as to the victim's continued illnesses. During trial, the victim's current caregiver testified that she had been caring for the victim since her discharge from the hospital; while in the caregiver's care, the victim had never needed

26

to be rushed to the emergency. room for medical issues, nor had she suffered any recurrences of liver failure or iron poisoning. [Doc. 8-2 at 259-60]. The victim did still need to attend numerous doctors' appointments, but these resulted from her prematurity. [Doc. 8-2 at 260, 270-72]. Thus, any testimony that the victim continued to require medical treatment would not have likely caused a different verdict for Defendant, as the victim's continued illness would have been attributable to her prematurity.

(Doc. 8-9 at 54-57).

The State maintains these claims are due to be denied. The State correctly recognizes that the state trial court's order is the last reasoned decision addressing them and that such order is therefore the focus of federal habeas review. See Wilson, 584 U.S. at 125. The State first argues that the claims are procedurally defaulted because the state trial court rejected them as "waived." (Doc. 8 at 27-28). The State also contends that, the state court alternatively rejected the claims on the merits, and that decision, the State says, is not unreasonable, legally or factually, under 28 U.S.C. § 2254(d)(1) or (2). (Id. at 28-31). The Court addresses these arguments in turn.

### A. Procedural Default

Federal habeas courts are generally precluded from granting relief on a claim "if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."

27

<u>Lee v. Kemna</u>, 534 U.S. 362, 375 (2002) (quoting <u>Coleman</u>, 501 U.S. at 729)

(alteration adopted). The Eleventh Circuit has explained:

> To determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision, we consider: (1) whether the last state court rendering a judgment in the case "clearly and expressly state[d]" that it relied on state procedural rules to resolve the federal claim without reaching its merits; (2) whether the decision "rest[s] solidly on state law grounds" and is not "intertwined with an interpretation of federal law"; and (3) the state procedural rule is adequate, i.e., not "applied in an arbitrary or unprecedented fashion."

<u>Thomas v. Att'y Gen.</u>, 992 F.3d 1162, 1184–85 (11th Cir. 2021) (quoting <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting <u>Card v. Dugger</u>, 911 F.2d 1494, 1516 (11th Cir. 1990)).

As further explained below, the Court concludes the state court's order does not clearly and expressly rely on an independent, state-law procedural bar on these claims. But even if it is assumed that the state court did clearly do so, the procedural bar would have been applied in an arbitrary or unprecedented fashion that is not adequate to support the judgment.

The trial court characterized its first basis for denial as Taylor's having "waived her right to make these [claims]," stating that they were "precluded by" her colloquy statements. (Doc. 8-9 at 54; <u>see also</u> <u>id.</u> at 57). "Waiver" is defined as "'an intentional relinquishment or abandonment of a known right

28

or privilege.'" Blanton v. State, 978 So. 2d 149, 155 (Fla. 2008) (quoting Barber v. Page, 390 U.S. 719, 725 (1968) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). A state court's determination that a defendant has "waived" a claim may serve as an independent and adequate state-law ground setting up a procedural default. See, e.g., Stewart v. Smith, 536 U.S. 856, 860-61 (2002); Owen v. Sec'y for Dep't of Corr., 568 F.3d 894, 909-10 (11th Cir. 2009); Gary v. Hall, 558 F.3d 1229, 1252–53 (11th Cir. 2009).

However, there are signs that the state court's decision does not truly rest on the doctrine of waiver. Specifically, in making its determination of a supposed waiver based on Taylor's colloquies, the trial court invoked the proposition that a "Rule 3.850 motion cannot be used to go behind representations the defendant made to the trial court, and the court may summarily deny post-conviction claims that are refuted by such representations," quoting Kelley, 109 So. 3d at 812-13. (Doc. 8-9 at 52) (emphasis added). That is significant because a Florida state court's summary denial of a claim on the ground that the claim is "refuted by the record" is an adjudication on the merits. See Pope v. Sec'y for Dep't of Corr., 680 F.3d 1271, 1285-86 & n.6 (11th Cir. 2012); Rule 3.850(h)(4), Fla. R. Crim. P. ("If the motion sufficiently states 1 or more claims for relief but the files and records in the

29

case conclusively show that the defendant is not entitled to relief as to 1 or more claims, the claims that are conclusively refuted must be summarily denied <u>on the merits</u> without a hearing." (emphasis added)).

Further, it was that principle of refutation by the record, not waiver, that the Florida state appellate courts applied in <u>Kelley</u> and the only other case the state court cited in this section of its order, <u>Terrell</u>. Indeed, neither <u>Kelley</u> nor <u>Terrell</u> mentions any variation of the word "waiver" in denying relief on any claim. Rather, in <u>Kelley</u>, the court held that defendant was not entitled to relief or an evidentiary hearing because his claim that counsel was ineffective for failing to challenge two jurors was "refuted by the record" where "the trial court asked Appellant whether he agreed with the jury, and Appellant responded that he did." 109 So. 3d at 812-13. And in <u>Terrell</u>, the court similarly affirmed the summary denial of a claim like Taylor's here, complaining of counsel's failure to call a witness, finding that the claim "was refuted by the record, given [the defendant's] sworn motion indicated his awareness of the substance of [the witness's] testimony" and the defendant's "sworn answers during [a] colloquy" acknowledging that he had not asked counsel to locate or call additional witnesses. 9 So. 3d at 1288-89. It thus appears that the state trial court might have rejected these claims on the same basis as the courts did in <u>Terrell</u> and

30

<u>Kelley</u>, that is, that the claims were conclusively refuted by the record. That would be a merits determination. Accordingly, it is not clear that the state court relied on an independent, state-law procedural bar.

But even assuming the trial court's order included a clear statement of reliance on the doctrine of waiver, that would not authorize a procedural default. When considering claims of ineffective assistance of trial counsel, Florida state courts do not regularly employ the rubric of waiver or procedural default when considering the legal significance of a defendant's prior statements to the trial court expressing satisfaction or agreement with counsel's actions. Instead, as <u>Terrell</u> and <u>Kelley</u> would suggest, Florida courts regularly examine whether the defendant's colloquies or other statements to the court are such that they conclusively "refute" the allegations of the claim as pleaded. <u>See, e.g.,</u> <u>Smith v. State</u>, 330 So. 3d 867, 882 (Fla. 2021); <u>McIndoo v. State</u>, 98 So. 3d 640, 641 (Fla. 4th DCA 2012), <u>Mendoza v. State</u>, 81 So. 3d 579, 581-82 (Fla. 3rd DCA 2012); <u>Worrell v. State</u>, 281 So. 3d 1275, 1277 (Fla. 1st DCA 2019); <u>Law v. State</u>, 847 So. 2d 599, 600-01 (Fla. 5th DCA 2003); <u>Hamilton v. State</u>, 860 So. 2d 1028, 1030 (Fla. 5th DCA 2003); <u>Townsend v. State</u>, 201 So. 3d 716, 717-18 (Fla. 4th DCA 2016). In other words, Florida state appellate courts consistently consider these claims on the merits, rather than

31

treating a defendant's prior expressions of satisfaction with counsel's strategy or action as a true waiver precluding consideration of the merits. Fla. R. Crim. P. Because any denial by the state trial court based on waiver would appear be novel and unexplained, it would not be adequate to establish a procedural default. See Cruz v. Arizona, 598 U.S. 17, 25-26 (2023).

### B. The Merits

The State also argues that, even if these claims are not procedurally defaulted, they are due to be denied because the state courts rejected them on the merits and that adjudication is entitled to deference under § 2254(d) that Taylor cannot overcome. The Court agrees.

As explained above, the state trial court's determination that the claims were "precluded" by Taylor's statements can itself be interpreted as a ruling on the merits, that applied the principle that Taylor's on-the-record sworn statements conclusively refuted her claims. In addition, the trial court proceeded to reject these claims even assuming they were not so "precluded," on the ground that the claims "lack merit." (Doc. 8-9 at 54). Because the state court rejected these claims on the merits, at least in the alternative, its decision is entitled to deference under 28 U.S.C. § 2254(d). See Sealy v. Warden, Ga. Diagnostic Prison, 954 F.3d 1338, 1368 (11th Cir. 2020).

32

"Claims that counsel failed to call witnesses are not favored on federal habeas review." McKiver v. Sec'y, Fla. Dep't of Corr., 991 F.3d 1357, 1365 (11th Cir. 2021) (quoting United States v. Guerra, 628 F.2d 410, 413 (5th Cir. 1980)[7]). Even if counsel fails to call any witnesses or to present any evidence in opposition to the prosecution's case, as here, that does not itself imply that counsel's performance was constitutionally deficient. See, e.g., Crawford v. Head, 311 F.3d 1288, 1311 (11th Cir. 2002); Tucker v. Francis, 723 F.2d 1504, 1516 (11th Cir. 1984), on reh'g sub nom. Tucker v. Kemp, 762 F.2d 1496 (11th Cir. 1985) (en banc). Rather, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." Knight v. Fla. Dep't of Corr., 936 F.3d 1322, 1340 (11th Cir. 2019) (quoting Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc)).

Further, the defendant's burden to establish prejudice under Strickland "is particularly 'heavy' [in this context] because often allegations of what a witness would have testified to are largely speculative.'" McKiver, 991 F.3d at 1365 (quoting Sullivan v. DeLoach, 459 F.3d 1097, 1109 (11th Cir. 2006)).

---

[7] Decisions of the Former Fifth Circuit handed down before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

33

"And, for that reason, … a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." Id. Accordingly, claims that counsel was ineffective for failing to call a witness are generally rejected where a habeas petitioner has failed to "demonstrate that the witness was available to testify and would have done so," id. at 1366 (quoting Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010)), and has "produced no affidavit or testimony from the witness." Id. at 1366 (quoting Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989) (modification adopted)); accord Estiven v. Sec'y, Dep't of Corr., No. 16-14056-D, 2017 WL 6606915, at *4 (11th Cir. Sept. 28, 2017) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." (quoting United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991)); McGill v. Shinn, 16 F.4th 666, 697 (9th Cir. 2021) (rejecting claim that counsel was ineffective for failing to call domestic violence expert; "[the defendant] speculates that an expert would have more effectively explained the effects of [his girlfriend's] domestic

34

violence, but he does not provide any expert report, declaration, or other evidence to support that speculation.").

Similarly, where a defendant claims that counsel was ineffective for failing to investigate, obtain, and present records, reports, or other documentary evidence, the defendant must generally submit copies of the documents in question to the court, because, without them, the defendant's speculation and self-serving characterizations as to their contents and potential effect at trial are not normally enough to establish prejudice. See Newson v. Sec'y, Dep't of Corr., 797 F. App'x 488, 492, 495 (11th Cir. 2019); Bing v. Sec'y, Fla. Dep't of Corr., No. 16-16827-D, 2018 WL 5503154, at *5–6 (11th Cir. Sept. 11, 2018); Bracknell v. Price, 223 F. App'x 929, 933 (11th Cir. 2007); see also McBride v. Sharpe, 25 F.3d 962, 972-73 (11th Cir. 1994) (defendant failed to show prejudice on claim that counsel was ineffective for failing to have forensic testing performed where defendant offered no test results or other evidence showing that such testing would have supported his defense).

The Court first considers the state court's rejection of these claims based on Taylor's colloquies. Again, in response to questioning by the court, Taylor expressly confirmed on two occasions, under oath, that she had been able to

35

consult with counsel, that she understood that counsel intended not to call any witnesses, that she did not know of any witnesses that she wanted counsel to call, and that she was satisfied with her counsel's investigation and performance. The state court found those statements refuted or otherwise precluded her claims alleging that counsel was ineffective for failing to investigate and present the slew of witnesses, reports, and additional medical records that Taylor only later said she had asked counsel to present.

The state court's rejection of these claim on this basis was not contrary to, or an unreasonable application of, Supreme Court precedent, see 28 U.S.C. § 2254(d)(1), nor does the decision rest on an unreasonable finding of fact, see id., § 2254(d)(2). The "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements and actions." Strickland, 466 U.S. at 691. Further, the defendant's "[s]olemn declarations in open court carry a strong presumption of verity" and may "constitute a formidable barrier in any subsequent collateral proceeding." Blackledge v. Allison, 431 U.S. 63, 74 (1977). In this vein, the Supreme Court held in Schriro v. Landrigan, 550 U.S. 465, 475 (2007), that, because the defendant acknowledged in a colloquy that he had instructed his counsel not to present any mitigating evidence at capital sentencing, "counsel's failure to investigate

36

further could not have been prejudicial under Strickland." Accordingly, the Landrigan Court held that the state court's summarily denial of a claim that counsel was ineffective for failing to investigate and present mitigation evidence was not unreasonable for purposes of § 2254(d). Id. at 475-81; also cf. Burton v. Comm'r, Ala. Dep't of Corr., 700 F.3d 1266, 1269-70 (11th Cir. 2012) (where trial court honored defendant's wishes, expressed in a colloquy, to call mitigation witnesses at sentencing against counsel's advice, state court decision that trial court did not violate defendant's right to counsel, and that counsel was not ineffective for failing to object, was not contrary to, or an unreasonable application of clearly established Supreme Court precedent).

Admittedly, Taylor's case does not involve such an affirmative "instruction" by the defendant as in Landrigan but, rather, only sworn expressions of agreement with or at least consent to counsel's plan to forego the presentation of a defense case. Nevertheless, the Eleventh Circuit has often recognized that the fact that the defendant has, after appropriate consultation, expressed agreement with counsel's proposed course of action strongly supports that counsel's pursuit of the strategy was not ineffective. See Hammond v. Hall, 586 F.3d 1289, 1327-28 (11th Cir. 2009); Ford v. Hall, 546 F.3d 1326, 1338 (11th Cir. 2008); Lobosco v. Thomas, 928 F.2d 1054, 1056-57

37

(11th Cir. 1991); Ross v. Wainwright, 738 F.2d 1217, 1222 (11th Cir. 1984); DiTullio v. Sec'y, Dep't of Corr., No. 22-13609, 2025 WL 784713, at *2-3 (11th Cir. Mar. 12, 2025); Acuna v. United States, 494 F. App'x 961, 962 (11th Cir. 2012); Guyton v. Butler, 490 F. App'x 331, 333 (11th Cir. 2012); but see Blanco v. Singletary, 943 F.2d 1477, 1492-94, 1500-05 (11th Cir. 1991) (holding, prior to both AEDPA and the Supreme Court's decision in Landrigan, that counsel was ineffective for failing to investigate and present mitigating evidence despite acknowledging that the defendant had "indicated he did not want any evidence offered on his behalf," suggesting that "[c]ounsel essentially acquiesced in [the defendant's] defeatism").

The Court assumes that the barrier to collateral relief presented by Taylor's colloquy statements, "while imposing, is not invariably insurmountable." Blackledge, 431 U.S. at 74 (1977). Nevertheless, the "subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Id. The only excuse that Taylor offers for telling the state court that she knew of no witnesses or evidence she wanted counsel to present and that she was satisfied with counsel's investigation and performance was that her counsel had coached her on her colloquy answers.

38

(See Petition at 12; Reply at 2, 5). However, the state court could have reasonably determined that such a belated, conclusory, and self-serving claim was not sufficient to refute the presumed truth of Taylor's clear prior statements made under oath in open court. See Winthrop-Redin v. United States, 767 F.3d 1210, 1216-17 (11th Cir. 2014); Jones v. White, 992 F.2d 1548, 1556-57 (11th Cir. 1993); Jackson v. United States, No. 1:14-CR-52-TWT-JSA-2, 2016 WL 7015713, at *4-5 (N.D. Ga. Oct. 25, 2016) (defendant's claims that he entered into plea agreement because he was "'threatened" by counsel and that his colloquy responses were "coached" were contradicted by his sworn testimony and did not "come close to overcoming the strong presumption of veracity of his sworn statements during the plea hearing"), report and recommendation adopted, 2016 WL 6995697 (N.D. Ga. Nov. 30, 2016). Nor has Taylor presented clear and convincing evidence to rebut such a finding. See 28 U.S.C. § 2254(e)(1); Smith v. Sec'y, Dep't of Corr., No. 805-CV-1355-T-26EAJ, 2009 WL 1513380, at *6 (M.D. Fla. May 27, 2009). The Court thus concludes that the state courts were not unreasonable in denying these claims on this basis under § 2254(d).

However, the Court also agrees with the State that the state court was not unreasonable for purposes of § 2254(d) in denying these claims on the

39

additional ground that they lacked merit because Taylor's allegations failed to show prejudice under Strickland. As the trial court explained, Taylor's counsel did present a defense by cross-examining the State's witnesses, objecting to evidence, and making arguments to the jury, raising many of the same points and theories that Taylor now says counsel should have presented through defense witnesses and additional medical records and reports. (Doc. 8-9 at 54-57). The trial court recognized, for example, that counsel had, in fact, strongly emphasized that there was no eyewitness or other direct evidence that Taylor had given R.T. iron supplements and that counsel had reasonably argued that the authorities had simply leapt to the conclusion that Taylor had abused R.T. because they learned that Taylor had previously been diagnosed with factitious disorder NOS and had a related history of harm to her other children. The trial court further recognized that counsel also had been able to show on cross-examination and otherwise highlight that R.T. was born prematurely at 26 weeks and as a result had suffered serious medical issues at birth, that Taylor had previously brought R.T. to the emergency room for valid concerns, that the testimony of various medical professionals was sometimes inconsistent, and that R.T. had continued to experience other health problems since being removed from Taylor's care. (See id. at 54-55).

40

The trial court next specifically discussed Taylor's claims alleging that counsel was ineffective for failing to present witnesses and evidence to support that R.T.'s liver dysfunction and elevated iron levels were the result of the hospital staff giving her Buminate, a brand name of an albumin blood protein solution. (Doc. 8-9 at 55). Those claims are central ones. The prosecution's theory of the case was that Taylor poisoned R.T., causing her liver dysfunction, by giving her over-the-counter iron supplement drops. However, it is undisputed that no one testified to having seen Taylor do so. Rather, the State's theory hinged largely upon medical testimony that R.T.'s high iron levels had to be from an exogenous source (i.e., not produced by R.T.'s own body) and would not have been caused by any of medical treatment she received at the hospital, including the albumin infusion specifically. The State then further argued, and the jury agreed, that Taylor must have secretly given R.T. iron supplement drops. However, that inference was based entirely on circumstantial evidence, including that R.T. was too young to have herself gotten into medication or another substance that could have caused her elevated iron levels. The State also highlighted Taylor's factitious disorder NOS, her history of causing harm to her other children for attention, and that, after R.T.'s elevated iron levels were detected, they promptly started going

41

down without medical intervention. The State's case was thus based substantially on eliminating other potential causes for R.T.'s iron increase, so if the defense could have made a convincing showing that the condition could have resulted from the albumin infusion, the outcome of the trial might have been much more in doubt. That is especially true because, unlike federal law, Florida state law provides that when the prosecution's case relies entirely on circumstantial evidence, the proof must exclude every reasonable hypothesis of innocence. See Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 460-61 (11th Cir. 2015).

Addressing these claims, the trial court noted that defense counsel had, in fact, asked witnesses on cross-examination about the hospital's giving R.T. albumin and whether it could have caused her elevated iron levels. (Doc. 8-9 at 55). However, the trial court recounted that the witnesses had testified that R.T. had received albumin "to support her liver functioning after her iron numbers had risen to a concerning level, not before." (Id. (emphasis original), citing Doc. 8-2 at 329-32, 365-66, 460-61). The trial court further recognized that the witnesses had also testified that albumin "would neither increase iron numbers nor cause an inflated iron reading." (Id. (emphasis original), citing Doc. 8-2 at 336, 407-09, 463-64). The trial court reasoned, however, that, even

42

if evidence could show that albumin could increase iron levels, it "would not have changed the outcome" of the trial because R.T. "was given Albumin only after her iron numbers had already increased to a concerning level." (Id.)

Taylor insists that the trial court's finding that the record shows R.T. was given albumin only after her iron levels were found to be elevated "is 100% false." (Reply at 2). The Court agrees. The transcript pages cited by the trial court to support that finding cover testimony from two witnesses: Dr. Sandra Bilyeu, a pediatric hospitalist who oversaw much of R.T.'s inpatient care, and Dr. Debra Esernio-Jenssen, a pediatrician who had previously served as the medical director of the Child Protection Team (CPT), see Fla. Stat. § 39.303. Dr. Bilyeu testified that hospital staff administered albumin to R.T. on or about March 20th, when it was determined she was suffering from liver disfunction. (Doc. 8-2 at 326-30, 364-66). Dr. Bilyeu further indicated that it was days later, on March 23rd, that the staff first performed toxicology tests that revealed R.T.'s elevated iron levels, explaining that such testing was prompted by a call from the CPT, advising they had received an anonymous tip to check for poisoning. (See Doc. 8-2 at 329-333, 366-68). Dr. Esernio-Jenssen testified similarly. She stated that, based on her review of R.T.'s medical records, R.T. started "taking a turn for the worse" on March 20,

43

whereupon it was determined that she was having problems with her liver, for which her treatment included a dose of albumin. (Id. at 461-63). Dr. Esernio-Jenssen then testified that it not until March 22nd or 23rd that staff performed toxicological testing that they found R.T. had elevated iron levels, which, she explained, they would not have previously been at. (Id. at 463-64). Thus, the testimony the trial court cited in its order does support that hospital staff gave R.T. an infusion of albumin after her liver dysfunction was detected. However, that testimony contradicts the trial court's assertion that R.T.'s iron levels had already been found to be elevated. Accordingly, the trial court's particular suggestion that any evidence that albumin could have caused R.T.'s increased iron levels could not have logically made any difference in the outcome at trial is unfounded.

While Taylor might have won that skirmish, she loses the war. Where "a state court rejects a petitioner's claim in a written opinion accompanied by an explanation, the federal habeas court reviews only the state court's 'decision' and is not limited to the particular justifications that the state court supplied." Pye v. Warden, Ga. Diagnostic Prison, 50 F.4th 1025, 1037-38 (11th Cir. 2022) (en banc). The state court's order concluding that Taylor failed to show prejudice is entirely reasonable in its reading of the testimony from Drs. Bilyeu

44

and Esernio-Jenssen, as well a third witness, Sandra Shapiro, a nurse practitioner who also worked for the CPT, each of whom denied that albumin could have caused R.T.'s elevated iron levels. (See Doc. 8-9 at 55, citing Doc. 8-2 at 336, 407-09, 463-64). Taylor claims that counsel was ineffective for failing to investigate and present witnesses, records, and other documentary evidence to show those prosecution witnesses were wrong and that albumin could have been the culprit. Specifically, she asserts that counsel should have obtained reports and records from the FDA and Baxter, the manufacturer of Buminate, the brand of albumin solution given to R.T., and procured representatives from Baxter and an expert hematologist to testify.

However, Taylor does not identify any such witness by name, nor does she allege that they would have been available to testify at her trial. Taylor also has never submitted to the state court or this one, an affidavit, § 1746 declaration, prior sworn testimony, a statement, report, or article from any witness indicating that they would testify to anything, including that an albumin infusion could have caused R.T.'s elevated iron readings. Taylor's just baldly claiming that counsel should have called witnesses who Taylor supposes to exist and would testify as she would hope is not sufficient to establish prejudice under Strickland. See McKiver, 991 F.3d at 1365-66; Estiven, 2017

45

WL 6606915, at *4. Similarly, Taylor failed to present the state court with any medical records, reports, or any other documentary evidence she says counsel should have investigated and presented. Without being able to review such documents, any claim that consideration of them might have resulted in a different verdict would also be speculative and insufficient. See Newson, 797 F. App'x at 492, 495; Bing, 2018 WL 5503154, at *5–6.

The Court would note that Taylor's Reply does attach an exhibit related to her claim that counsel was ineffective for failing to obtain records from the FDA supporting that albumin could have caused R.T.'s iron increase. (See Petition at 7, 31; Reply at 3, 11-13). That exhibit consists of three pages, each captioned, "FDA Adverse Event Reporting System (FAERS), Freedom of Information Act (FOIA), Detailed Report." (Reply at 11-13, FAERS Report). They appear to be excerpted from what was originally a 599-page document, printed out on March 26, 2019, about seven months after Taylor's trial. (Id.) Taylor characterizes the FAERS Report as documenting an underlying report received by the FDA indicating that the hospital's administration of Buminate "caused 'Blood Iron Increase' in [R.T.]." (Reply at 3, quoting id. at 13).

However, federal courts generally will not consider new evidence or arguments presented for the first time in a reply brief. See Sanchez v. Dixon,

46

No. 18-24192-CV, 2023 WL 5612499, at *5 n.11 (S.D. Fla. June 5, 2023); <u>see also</u> <u>United States v. Levy</u>, 379 F.3d 1241, 1244 (11th Cir. 2004). More importantly, federal habeas review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. <u>Shoop v. Twyford</u>, 596 U.S. 811, 819 (2022); <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011)). Taylor did reference an FDA report about albumin in her Rule 3.850 motion (Doc. 8-9 at 35, 43), but there is no indication that she presented the FAERS Report (or any other documentary evidence) to the state trial court. The record shows that she did attach a copy of those pages to her <u>pro se</u> brief on her state collateral appeal. (Doc. 8-10 at 36-41). However, it is firmly established that Florida appellate courts will not consider evidence that was not before the trial court. <u>Mariani v. Schleman</u>, 94 So. 2d 829, 831 (Fla. 1957); <u>Supinski v. Omni Healthcare, P.A.</u>, 853 So. 2d 526, 532 (Fla. 5th DCA 2003). Accordingly, this Court cannot consider the FAERS Report.[8] Even if the Court

---

[8] Taylor's Reply also attaches another exhibit, a photocopy of what she describes as a Florida Department of Children and Families (DCF) "intake photo" of R.T. when she was "allegedly severely injured from Iron." (Reply at 14-15). Taylor presumably offers it to support to her claim that a "DCF attorney," Douglas Massey, could have testified to "photographic evidence that was dated and time stamped and in his possession proving that at no time was [R.T.] injured or neglected." (Petition at 7; <u>see also</u> Doc. 8-9 at 34). However, Taylor also did not present this evidence to the state court, so this Court cannot consider it, either. <u>See</u> <u>Twyford</u>, 596 U.S. at 819; <u>Pinholster</u>, 563 U.S. at 181. But even if Court did so, the photo merely depicts, in black and white, in

47

were to do so, however, it would not make a difference, as further discussed below.[9]

"Adverse event reports describe medical events that occurred during or after an individual's use of a prescription drug, which are submitted directly to the FDA by patients, healthcare professionals, and drug manufacturers." In re Abilify (Aripiprazole) Prods. Liab. Litig., 299 F. Supp. 3d 1291, 1309 (N.D. Fla. 2018) (citing 21 U.S.C. § 314.80(a)). "Physicians and patients are encouraged to report such events voluntarily, whereas drug manufacturers are required to do so." Id., at 1309 n.21 (citing 21 C.F.R. §§ 310.305, 312.32, 314.80). See also Thibault v. FDA, No. 8:15-CV-1813-T-36TGW, 2017 WL 2116939, at *2 (M.D. Fla. Mar. 31, 2017) (further describing the operation of the FAERS). "The primary purposes of maintaining the [reporting system] data base is to serve as an early warning or signaling system." Soldo v. Sandoz

---

low resolution and low light, a front view of a clothed infant with a blanket wrapped around its midsection and upper legs, seemingly asleep, lying in what looks like a bouncy seat. (Reply at 15). It suffices to say that the photo itself does not prove anything of material substance. As such, any failure by counsel to obtain or present the photo would not be ineffective under Strickland.

[9] The Court deems it appropriate to further discuss the FAERS Report in the text because Taylor has made much in her Petition and Reply of FDA materials that supposedly show a link between the albumin infusion and R.T.'s elevated iron level. Further, the FAERS Report is the only evidence that Taylor has ever submitted, other than her own speculation, to support that theory. The FAERS Report also was not addressed by the state court or by the State in its briefing in this Court.

Pharms. Corp., 244 F. Supp. 2d 434, 463–64 (W.D. Pa. 2003) (quoting Brief

Description with Caveats of System, Surveillance and Data Processing Branch

of the Division of Epidemiology and Surveillance, Division of Epidemiology &

Surveillance, Dec. 1988, at p. 1 (1988 FDA Caveats)). "Physicians are

encouraged to report all suspected drug events, not just those that are known

to have been caused by the drug." Id. at 464 (quoting 1988 FDA Caveats). Drug

manufacturers, in turn, are obligated by law to report to the FDA any "adverse

drug experience" involving their drugs, 21 C.F.R. § 314.80(c)(1), defined

broadly as "any adverse event associated with the use of a drug in humans,

whether or not considered drug related, including … [a]n adverse event

occurring in the course of the use of a drug product in professional practice."

Id., § 314.80(a). Further, if a manufacturer receives a report from a healthcare

professional or consumer, it is required to forward the report to the FDA. Id.,

§ 314.80(b).

The FAERS Report documents three underlying adverse event reports,

only one of which is relevant.[10] (See Reply at 13). The FAERS Report indicates

_____

[10] As discussed in the text, the FAERS Report includes an adverse event report that
Taylor claims to correspond to the hospital's administration of albumin to R.T. in
March 2013. The two other adverse event reports referenced in the FAERS Report
involve incidents in which albumin was deemed "suspect" in relation to a "tremor" in

that the FDA received that report on April 15, 2013, assigning it case number,

9231910 (id.), as referenced in Taylor's Petition. (Petition at 31). The case type

is listed as "Expedited (15-Day)" (Reply at 13), defined as one associated with

a report "submitted to FDA by manufacturers" and related to "serious,

unexpected adverse events." See 21 C.F.R. §§ 314.80(b), (c)(1); (see also Reply

at 11). Under "Outcomes," the FAERS Report lists "HO" (Reply at 13), short

for "Hospitalization" (id. at 11), indicting a "serious adverse drug experience."

See 21 C.F.R. § 314.80(a). The FAERS Report does not provide case-specific

information about the patient or healthcare facility, other than to say that it

involved a 109-day-old female patient in the United States. (Reply at 13). The

report cited that the patient's "blood iron increased" and that she had an

"infusion related reaction" after being given Buminate, manufactured by

Baxter, and Lasix, both intravenously, Zantac and Aldactone orally, as well as

potentially an "iron supplement" not otherwise specified from an "unknown"

source. (Id.) The report identifies the Buminate and the unknown iron

---

a 75-year-old male patient in Canada in March 2013 and an otherwise unidentified
"product quality issue" in connection with an American patient in April 2013. (Reply
at 13). Taylor's brief on her state collateral appeal attached three additional pages
excerpted from the same 599-page FDA document. (See Doc. 8-10 at 37, 39, 40). Those
referenced five additional adverse event reports, four that appear to involve albumin,
but none with suspected association with excessive or increased iron in the blood.
(See id.)

supplement as "Suspect" (see id. at 12-13), meaning they were "the product(s) deemed by the initial reporter as most likely to be associated with the event." (Id. at 12).

Taylor asserts that the adverse event in the FAERS Report corresponds to R.T.'s treatment at Wolfson Children's Hospital in March 2013. The FAERS Report does not directly show that. But its contents are consistent with the proposition, and the Court will assume that Taylor is correct. However, to sustain a claim that counsel was ineffective for failing to investigate an avenue of inquiry, a defendant must allege and prove what specific additional evidence would have been discovered and that it supports a reasonable probability of a different outcome at trial. See Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1332-34 (11th Cir. 2012). To that end, the FAERS Report is the only piece of evidence that Taylor has ever actually identified or produced to support her theory that albumin caused R.T.'s iron increase. And Taylor cannot show prejudice based on any alleged failure to obtain the FAERS Report because, as further discussed below, there is not a reasonable probability that it would have been admitted and altered the outcome at trial. See McKiver, 991 F.3d at 1369-70.

51

"Adverse event reports are daily events in the pharmaceutical industry," and the "fact that a user of a drug has suffered an adverse event, standing alone, does not mean that the drug caused that event." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 43–44 (2011). Such "reports are anecdotal, meaning they are based on descriptions of unmatched individual cases rather than on controlled studies." McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1250 (11th Cir. 2005) (internal quotation marks and citation omitted). Thus, they are "merely accounts of medical events [and] reflect only data, not scientific methodology." Id. at 1254 (quoting Rider v. Sandoz Pharmaceuticals Corp., 295 F.3d 1194, 1199 (11th Cir. 2002)). The FDA reporting system itself also

> has several intrinsic limitations, including (1) uncertainty that the drug actually caused the reported event, since the FDA does not require that causation be proven before adverse event data is reported; (2) insufficient detail from which to evaluate causation; (3) information in the reports is unverified and subject to a variety of reporting biases; and (4) the underlying data may be affected by reporting bias stemming from publicity or litigation.

In re Abilify (Aripiprazole) Prods. Liab. Litig., 299 F. Supp. 3d at 1310; (see also Reply at 11 ("FAERS data have limitations, including … [that] [t]here is no certainty that the reported event was actually due to the product" and that "[m]any factors can influence whether or not an event will be reported.")). The FDA regulation itself recognizes that neither the submission of adverse event

52

reports or information nor any release thereof by the FDA "necessarily reflect[s] a conclusion by the [drug manufacturer or other reporting party] or the FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse effect." 21 C.F.R. § 314.80(*l*).

"[B]ecause they contain what amounts to 'uncontrolled anecdotal information,' adverse event reports are generally considered 'one of the least reliable sources' of support for a causation opinion." In re Abilify (Aripiprazole) Prods. Liab. Litig., 299 F. Supp. 3d at 1310 (quoting McClain, 401 F.3d at 1250 (alteration adopted)). And "while they may support other proof of causation, case reports alone ordinarily cannot prove causation." McClain, 401 F.3d at 1254 (quoting Rider v. Sandoz Pharmaceuticals Corp., 295 F.3d 1194, 1199 (11th Cir. 2002)). Indeed, the Supreme Court has recognized that "the mere existence of reports of adverse events … says nothing in and of itself about whether the drug is causing the adverse events." Matrixx Initiatives, 563 U.S. at 44. FDA adverse event reports themselves are also subject to exclusion at trial as hearsay, where they are offered to prove the truth of their contents, as well as on the ground that any probative value is substantially outweighed by the danger of unfair prejudice. See Goldstein v. Centocor, No. 05-21515 CIV, 2007 WL 7428597, at *1-4 (S.D. Fla. May 14, 2007), aff'd sub nom. Goldstein v.

53

Centocor, Inc., 310 F. App'x 331, 332 n.1 (11th Cir. 2009); see also generally Rules 403, 802, Fed. R. Evid.; Fla. Stat. §§ 90.403, 90.802.

In the context of Taylor's ineffective-assistance claim, the FAERS Report might only have probative value insofar as it could prove that the hospital's albumin infusion caused R.T.'s iron increase. However, that would require consideration of the FAERS Report for its truth, making it inadmissible hearsay. See Goldstein, 2007 WL 7428597, at *1-3. Accordingly, there is no indication that the FAERS Report would have been considered at trial, precluding a finding of prejudice under Strickland. See McKiver, 991 F.3d at 1369-70.

But even assuming it was not objectionable as hearsay, the FAERS Report is also patently unreliable proof of causation. The document states that both Buminate and some unknown iron supplement were deemed "suspect" products associated with the increase in iron in the patient's blood. However, an adverse event report does not itself support an inference of causation. See Matrixx Initiatives, 563 U.S. at 44; McClain, 401 F.3d at 1250, 1253-54. The report is designated as an "Expedited (15-Day)" case type, indicating the FDA received it from the drug manufacturer, Baxter, rather than a healthcare provider or patient. (See Reply at 11). However, because the regulation imposes

54

a broad duty on manufacturers to report adverse events, and to forward all adverse event reports received from providers and patients, a manufacturer might reasonably consider itself bound to report an event to the FDA even when the manufacturer does not believe, and that the available information does not support, that its drug actually caused or contributed to the event. See 21 C.F.R. §§ 314.80(b), (c)(1), (*l*). Further, the FAERS Report does not identify: (1) the person(s) at Baxter who decided to send the underlying report to the FDA, (2) the person(s) who generated the original report of the adverse event, (3) the information or criteria upon which any decision to report was made, or (4) any information or methodology supporting the listing of Buminate as a "suspect" product. As such, the FAERS Report would have almost certainly been excluded as creating a danger of unfair prejudice under Rule 403. See Goldstein, 2007 WL 7428597, at *3-4. Even if it weren't, the State would have been easily able to demonstrate the report's inherent unreliability, such that there is not a reasonable probability that it would have altered the outcome of Taylor's trial. Accordingly, the state court's ruling that Taylor cannot show prejudice on her claim regarding counsel's purported failure to further investigate the alleged link between Buminate and R.T.'s elevated iron level is not unreasonable under 28 U.S.C. § 2254(d).

55

Finally, the state court addressed the merits of Taylor's specific claims complaining that counsel should have further investigated and presented various witnesses and evidence supporting that Taylor was a good mother and that R.T. continued to experience health problems even after she was removed from Taylor's care. (Doc. 8-9 at 55-57). The state court rejected them on the ground that Taylor again could not show prejudice under Strickland because her proposed evidence was cumulative of that presented at trial. (Id.) The State court's decision is not unreasonable for purposes of § 2254(d). Moreover, Taylor has never presented, to the state court or this one, an affidavit, declaration, or other evidence (other than her own self-serving allegations) to support that any witness was available and would have testified as Taylor supposes or that any additional documentary evidence actually existed and would have made a difference at trial. See McKiver, 991 F.3d at 1365-66; Estiven, 2017 WL 6606915, at *4; Newson, 797 F. App'x at 492, 495; Bing, 2018 WL 5503154, at *5–6. Taylor's ineffective assistance claims alleging that counsel was ineffective in failing to further investigate and present witnesses and documentary evidence are denied.

**2. Advising Taylor Against Testifying (Included in Ground Two)**

56

Taylor claims that counsel was ineffective because he "pressured [Taylor] not to testify on her own behalf." (Petition at 12). Taylor does not identify the means of such "pressure," other than to say that counsel "told her [that] because of the nature of the case her testimony would never be believed." (id.; see also Reply at 4-5). Accordingly, this claim is, in essence, that counsel's performance was deficient in recommending to Taylor that she should not take the stand.

Taylor has the burden to establish deficient performance and prejudice under Strickland. See United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992) (en banc). As to the former, "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." Id. at 1533; see also Magill v. Dugger, 824 F.2d 879, 887 (11th Cir. 1987). Thus, a defendant must show that counsel's advice regarding whether to testify fell below an objective standard of reasonableness. See Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292, 1318 (11th Cir. 2005). On the prejudice side, a defendant must show that, absent counsel's allegedly erroneous advice, there is a reasonable probability she would have testified. See Nejad v. Att'y Gen., State of Georgia, 830 F.3d 1280, 1295 (11th Cir. 2016).

57

A defendant must then further show that there is a reasonable probability that his or her proposed testimony would have altered the outcome of the trial. See Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1130 (11th Cir. 2012).

Taylor included this claim within Ground Three of her amended Rule 3.850 motion. (Doc. 8-9 at 35). The trial court order denying the Rule 3.850 motion is the last reasoned decision addressing this claim. See Wilson, 584 U.S. at 125. It shows the trial court rejected this claim for failure to show prejudice under Strickland. (See Doc. 8-9 at 57-58). The trial court first held that the claim was subject to dismissal because Taylor's Rule 3.850 motion did not allege the substance of her would-be testimony. (Id. at 58). The trial court further opined that, even "assuming she would have declared her innocence, such a declaration would not have brought new information to light" that might have changed the outcome of the proceeding. (Id.) In addition, the trial court found that Taylor's sworn colloquy at trial showed that she had "voluntarily agreed not to take the stand," thus indicating that counsel's advice did not cause Taylor to waive her right to testify. (Id.)

The state court's dismissal of the claim as insufficiently pleaded because Taylor's Rule 3.850 motion failed to set forth her proposed trial testimony is an adjudication on the merits for purposes of 28 U.S.C. § 2254(d). See Pope, 680

58

F.3d at 1286. So is the state court's alternative rejection of the claim without a hearing based on consideration of the motion's allegations as against the facts shown by the record of the proceedings. See id.; Owen v. Sec'y for Dep't of Corr., 568 F.3d 894, 913 (11th Cir. 2009).

The state court's conclusion that Taylor failed to establish prejudice is not contrary to, or an unreasonable application of, Strickland or other Supreme Court precedent, 28 U.S.C. § 2254(d)(1). Nor is it based on an unreasonable finding of fact, id., § 2254(d)(2). As recognized by the trial court, Taylor acknowledged in a colloquy that she had fully discussed with counsel whether she should take the stand, she understood it was ultimately her decision, she had received no threats or promises, that she was satisfied with the advice of her counsel, and that she was declining to testify. (See Doc. 8-2 at 503-07). Those sworn statements are presumed to have been truthful. See Blackledge, 431 U.S. at 74. Accordingly, the trial court could have reasonably determined that Taylor knowingly and voluntarily waived her right to testify and that there was not a reasonable probability that she would have testified but for the allegedly flawed advice of counsel. See Lott v. Att'y Gen., Florida, 594 F.3d 1296, 1302-03 (11th Cir. 2010); Thomas v. United States, No. 16-14955-B, 2018 WL 11301192, at *6 (11th Cir. Nov. 19, 2018); Shaw v. Sec'y, Fla. Dep't of Corr.,

No. 3:19-CV-1442-HES-MCR, 2021 WL 3494164, at *9-10 (M.D. Fla. Aug. 9, 2021); see also Teague, 953 F.2d at 1535 (defendant failed to show prejudice where district court's findings that the defendant "was advised of his right to testify, was advised that he should not exercise that right, and did not protest" were not clearly erroneous).

Further, as the trial court also pointed out, Taylor did not allege in her Rule 3.850 motion what her specific testimony would have been. It is true that "[t]he "testimony of a criminal defendant at his own trial is unique and inherently significant" because "[w]hen the defendant testifies, the jury is given an opportunity to observe his demeanor and to judge his credibility firsthand." Nichols v. Butler, 953 F.2d 1550, 1553–54 (11th Cir.1992). Nevertheless, where the defendant does not identify any specifics of their proposed trial testimony, a state court might reasonably conclude that the defendant has failed to show that there is a reasonable probability that her testimony would have made a difference. See Morris, 677 F.3d at 1129-30; Torres v. Sec'y, Dep't of Corr., No. 16-17325-E, 2017 WL 5997387, at *6 (11th Cir. June 2, 2017); Jones v. Sec'y, Dep't of Corr., 487 F. App'x 563, 567-68 (11th Cir. 2012). The state court's reasonable determination that Taylor failed to show prejudice is alone enough to deny habeas relief without considering

60

Strickland's performance prong. See Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1126 (11th Cir. 2012). This claim is denied.

### 3. Failure to Object to, or Otherwise Properly Dispute, the State's Evidence and Arguments (Included in Grounds Six, Eight, Nine, and Eleven)

Taylor contends that her trial counsel was ineffective for failing to object to and otherwise counter various arguments and evidence presented by the prosecution. Specifically, in Ground Six, Taylor contends that counsel was ineffective for failing to properly challenge the prosecution's use of "Williams Rule" evidence of prior bad acts. (Id. at 21-22). In Ground Nine, she claims that counsel should have objected to testimony by the State's psychological expert witness, Dr. Deborah Day. (Id. at 29-30). And finally, in Ground Eleven, Taylor argues that her counsel was ineffective at sentencing for failing to properly argue against the State's claim that R.T.'s injury should be increased from "great" to "severe" bodily injury. (Id. at 33-34). The Court considers these claims in turn.

### a. Failure to Challenge "Williams Rule" Notice and Evidence

Taylor contends in Ground Six that counsel was ineffective for failing to properly challenge "Williams Rule" evidence. (Petition at 21-22). The "Williams Rule" refers to Williams v. State, 110 So. 2d 654 (Fla. 1959), which held that

evidence of other crimes and prior acts is admissible in a criminal trial under Florida law if relevant to prove anything other than the bad character of the defendant or propensity to commit the crime charged. The rule is codified in Fla. Stat. § 90.404 and is substantially similar to Federal Rule of Evidence 404.

The State filed a pre-trial notice of its intent to offer <u>Williams</u> Rule evidence at trial, pursuant to Fla. Stat. § 90.404(d)(1). (Doc. 8-1 at 64-65). The State said it planned to show that the State of California had removed four of Taylor's children from her care and that she had pleaded guilty to criminal charges of child abuse/neglect, on allegations that she had injured and neglected such children consistent with her diagnoses of factitious disorder. The State alleged that those criminal charges were from 2002, based on conduct occurring between approximately 1995 to 2001. (<u>Id.</u> at 64). The State also advised that it intended to present similar evidence that the State of Arizona had removed five of Taylor's other children, also based on her factitious disorder, with the misconduct occurring between 2003 and 2010. (<u>Id.</u>)

The state court held a hearing on the State's notice at which counsel for both sides presented lengthy arguments. (Doc. 8-1 at 158-219), Following the hearing, the state court issued an order "conditionally granting" admission of the State's proposed <u>Williams</u> Rule evidence. (<u>Id.</u> at 66-80). Such evidence was

later admitted at trial, with a limiting instruction, related to Taylor's history of misrepresenting, exaggerating, and creating medical issues in her other children, including by injecting one of them with unprescribed insulin. (See Doc. 8-9 at 58 (citing Doc. 8-2 at 290-97, 342-43, 392-93, and 482-87)).

Taylor first claims that her counsel was ineffective because he "failed to dispute statements" in the State's Williams Rule notice, which she says was "highly prejudicial and misrepresent[ed] facts." (Petition at 21). Taylor raised this claim in Ground Eight of her Rule 3.850 motion. (Doc. 8-9 at 40). The state trial court summarily dismissed it, finding Taylor "had failed to note which specific statements in the State's [Williams Rule notice] counsel failed to dispute and how that failure ultimately prejudiced [her]." (Doc. 8-9 at 59). That disposition, based on the failure to plead sufficient facts to state a claim, is a rejection on the merits. See Pope, 680 F.3d at 1285-86. The state court's decision is not contrary to, or an unreasonable application of, Supreme Court precedent, nor is it based on an unreasonable determination of the facts. See § 2254(d). Habeas relief is denied on this claim.

Taylor also complains, "Had defense counsel requested transcripts [of the Williams Rule hearing], he could have questioned the State's witnesses as to collateral evidence in the case." (Petition at 21). Taylor laments that her

63

"attorney never brought up at trial the <u>Williams</u> Rule hearing testimony by the State Prosecutor Alan Mizrahi, where he stated that there was no evidence in the case, only theory and speculation." (<u>Id.</u>) The trial court summarily rejected the claim as well, recognizing that nothing the prosecutor might have said in arguments at the <u>Williams</u> Rule hearing was evidence, nor could it have been used to impeach witnesses at trial. (<u>Id.</u> at 59). Again, the state trial court's decision is not unreasonable under either prong of § 2254(d). Habeas relief is thus also denied on these claims.

> b. *Failure to Move for a Dismissal Based on Insufficient Evidence*

In Ground Eight, Taylor claims that counsel "was ineffective for failing to file a motion to dismiss due to failure to prove a prima facie case." (Petition at 27). Taylor emphasizes that, while the prosecution's theory was that she secretly poisoned R.T. with iron supplements, no evidence was presented that Taylor had purchased, possessed, or researched iron supplements. (<u>Id.</u>) She also claims that the State secured a conviction on the child neglect count based on evidence that she was guilty of "failing to give [R.T.] iron drops," and that the "State can't have it both ways." (<u>Id.</u>) Finally, Taylor again argues that counsel should have shown and argued that R.T.'s elevated iron level detected at the hospital could be explained as a side effect of the albumin infusion. (<u>Id.</u>)

64

Taylor raised a similar claim in Ground Twelve of her Rule 3.850 motion, although she did not argue anything specifically about her conviction on the child neglect count being based on her underline failure to give R.T. iron. (See Doc. 8-9 at 41-42). The state trial court summarily rejected the claim, first concluding that defense counsel had specifically emphasized at trial that there was no direct evidence that Taylor had given R.T. iron drops and that Taylor had consistently denied doing so. (Doc. 8-9 at 61). The trial court also concluded that counsel was not ineffective in failing to file a motion to dismiss because such a motion would have failed. (Id.) Specifically, the trial court recognized that the State might rely entirely on circumstantial evidence to establish that Taylor had given R.T. iron drops and that the proof at trial was sufficient to draw that inference. (Id. at 61-62). The trial court then identified such evidence, including that Taylor had been diagnosed with factitious disorder NOS and had injected another one of her children with unprescribed insulin, supporting motive; that R.T.'s elevated iron had to be result of an exogenous source of iron, which could not have been from R.T. ingesting it alone or from medical treatment she had received; and testimony that R.T. had not suffered liver damage or other symptoms of iron poisoning since being removed from Taylor's care. (Id.).

65

The state court's rejection of this claim is not contrary to, or an unreasonable application of, <u>Strickland</u> or other Supreme Court precedent, 28 U.S.C. § 2254(d)(1), nor is the decision based on an unreasonable determination of the facts. <u>Id.</u>, § 2254(d)(2). Under both Florida state law and federal law, a criminal conviction may rest solely on circumstantial evidence. <u>See</u> <u>Preston</u>, 785 F.3d at 460-61. The state trial court was not unreasonable in determining that defense counsel was not ineffective because a motion to dismiss would have failed given the circumstantial evidence presented at trial. <u>See</u> <u>Pinkney v. Sec'y</u>, DOC, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

But the claim also fails at a more fundamental level: Although neither the state court's order denying the Rule 3.850 motion nor the State's Response in this Court acknowledges as much, Taylor's counsel <u>did</u>, in fact, move for a judgment of acquittal at the close of the State's case, arguing specifically that there was no direct evidence that Taylor had poisoned R.T. and that the circumstantial evidence was insufficient. (Doc. 8-2 at 497-98). In substance, that was a motion made at trial to dismiss the case based the alleged insufficiency of the government's proof. The trial court, after hearing

66

arguments from both sides, denied the motion. (Id. at 497-500). The record thus plainly refutes that counsel might have been deficient for failing to seek a dismissal of the case for insufficient evidence. Because the trial court's rejection of this claim was not unreasonable under § 2254(d), habeas relief is denied.

### c.    *Failure to Challenge the Testimony of Dr. Day*

In Ground Nine, Taylor contends that her counsel was ineffective "for failing to reveal a conflict of interest with" Deborah Day, Ph.D., a psychologist who testified on behalf of the State. (Petition at 29; see also id. at 48-49). Dr. Day told the jury that she had testified as an expert in about 650 cases, about 300 of which concerned child abuse, and that she had co-authored a book and published two articles on factitious disorder NOS. (Doc. 8-2 at 275-78). Dr. Day further related that she had evaluated Taylor, meeting with her twice in 2013 and reviewing medical records and other materials related to Taylor, R.T., and Taylor's other children. (Id. at 284-85, 290-92). She testified that she found Taylor has a history of harming her children and intentionally misrepresenting their medical symptoms, mostly for attention, but also for some financial gain through a GoFundMe page. (Id. at 292-94). Finally, Dr. Taylor opined that Taylor meets the criteria for a diagnosis of factitious disorder NOS. (Id. at 294).

67

Taylor asserts here that counsel "failed to reveal [that Dr. Day] was a member of the Child Protection Team, which was organized to provide integrated professional responses dealing with problems arising when a child has allegedly been abused by her parent." (Petition at 29). Taylor says that the CPT was "assisted in prosecuting [her]" and that "[t]his conflict of interest was highly prejudicial." (Id.) The Petition also alleges that Dr. Day "was hired by [Taylor's] attorney in her DCF case to evaluate [her] for mental illness and to confirm or deny a diagnosis of Factitious Disorder NOS (Munchausen Syndrome by Proxy)." (Id.) Taylor reports that she had two sessions with Dr. Day, following which, Taylor says, Dr. Day reported to Taylor and her attorney in the DCF case that she, Dr. Day, had "confirmed no mental illness was present" but "was unable to conform or deny factitious disorder NOS." (Id.) According to Taylor, however, by the time of trial, Dr. Day "had 'adopted' and testified to a 2007 evaluation of [Taylor] by Brenda Bursch Ph.D. that was used in [Taylor's] Arizona DCF case," in which five of Taylor's children were removed from her custody. (Id.) Taylor alleges that Dr. Bursch was not licensed in Arizona and that the prosecution used Dr. Day "to bring in and testify to [Dr. Bursch's] 2007 report," which Taylor argues was inadmissible hearsay and was "highly prejudicial." (Petition at 29-30). Therefore, Taylor claims that her

68

counsel should have objected to Dr. Day "being used in any capacity." (Id. at 30).

The State acknowledges that Ground Thirteen of Taylor's Rule 3.850 motion raised an ineffective assistance claim alleging that counsel did not properly object to or otherwise challenge Dr. Day's trial testimony. (See Doc. 8 at 46; Doc. 8-9 at 42). The State emphasizes, however, that such theory only encompassed the first part of the claim as described above. That is, Taylor's Rule 3.850 motion alleged in material part only as follows:

> [Taylor's trial attorney … failed to reveal a potential conflict of interest … since the [State's] psychologist witness was a member of the Child Protection Team organized to provide integrated professional response to deal with problems arising when a child has allegedly been abuse [redacted]. The same team that assisted in prosecuting [her]. This was highly inflammatory and prejudicial. Had [counsel] objected to this witness it could have led to an acquittal at trial.

(Doc. 8-9 at 42). The State also concedes that Taylor has exhausted the claim insofar as it alleges that counsel was ineffective for failing to elicit evidence that Dr. Day had a "conflict of interest" as a member of the CPT and for failing to object to Dr. Day's testimony on that basis. (See Doc. 8 at 46-49 & nn. 7, 8). However, the State argues that Taylor has not exhausted and has procedurally defaulted the claim to the extent it is based on additional allegations and arguments not presented to the state court, including that counsel should have

objected to Dr. Day's testimony, on hearsay grounds or otherwise, because she had allegedly "adopted and testified to" Dr. Bursch's 2007 evaluation. (Id. at 51-52). Alternatively, the State argues that aspect of the claim is due to be denied on the merits. (Id. at 52).

A claim is deemed exhausted provided that "the substance of [the claim] was first presented to the state courts, despite variations in the factual allegations urged in its support." Freeman v. Comm'r, Ala. Dep't of Corr., 46 F.4th 1193, 1217 (11th Cir. 2022) (cleaned up); see also Pope v. Sec'y for Dep't of Corr., 680 F.3d 1271, 1286 (11th Cir. 2012). However, where the state courts summarily reject on the merits a claim that is the same in "substance" as one later presented to a federal court on federal habeas but which includes additional supporting factual allegations, review of the state court's decision under § 2254(d) is limited to the state court record, including only the allegations raised in state court. See Freeman, 46 F.4th at 1223 (citing Powell v. Allen, 602 F.3d 1263, 1273 n.8 (11th Cir. 2010); Borden v Allen, 697 F.3d 785, 816 (11th Cir. 2011)).

The Court concludes that the claim that Taylor presented in Ground Thirteen of her Rule 3.850 motion, arguing that counsel was ineffective for failing to properly challenge Dr. Day's testimony, is in substance the same

claim she presents in Ground Nine of her federal habeas Petition, even though

the latter includes additional factual exposition. See Freeman, 46 F.4th at

1217-19; Pope, 680 F.3d at 1295-96. Accordingly, the claim in Ground Nine of

the Petition is exhausted. See id.

Addressing the claim as presented in Taylor's Rule 3.850 motion, the

state trial court characterized it as alleging that counsel was ineffective

because he "failed to ensure that the jurors knew … [Dr. Day] was inherently

biased against [Taylor] because she was a member of the Child Protection

Team." (Doc. 8-9 at 61). The state court summarily denied the claim on the

merits, concluding that Taylor failed to show prejudice under Strickland

because Dr. Day had, in fact, specifically acknowledged on the stand that she

had worked for about 25 years as the psychologist for the Child Protection

Team in the greater Orlando area. (Id. at 62 (citing Doc. 8-2 at 276)). The state

court did not directly address Taylor's contention that counsel should have

"objected to" Dr. Day's testimony. (Doc. 8-9 at 43). Nevertheless, the state court

denied the "claims of ineffective assistance of counsel on Ground[] … Thirteen."

(Id. at 62).

In reviewing the state court's decision under § 2254(d), this Court may

consider only the allegations of Ground Thirteen of the Rule 3.850 motion and

71

the state court record, and not the supplemental allegations that appear for the first time in Ground Nine of the federal habeas Petition.[11] See Freeman, 46 F.4th at 1223. Doing so, the Court concludes that the state court's rejection of the claim for failure to show prejudice is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1), nor is the decision based on an unreasonable application of the facts, § 2254(d)(2). As the state court recognized, Dr. Day unambiguously disclosed on the stand that she had long worked as a psychologist for the CPT, so no prejudice could have resulted from any alleged failure by defense counsel to "reveal" that relationship. Nor does the Court see how Dr. Day's affiliation

---

[11] Accordingly, under § 2254(d), the Court cannot consider Taylor's new allegations in the Petition that: (1) Dr. Day had previously been hired by Taylor's attorney in her Florida DCF case to perform an evaluation, (2) Dr. Day had told Taylor and her DCF attorney following that evaluation that Taylor did not have mental illness and that Dr. Day could neither confirm nor deny a diagnosis of factitious disorder NOS and (3) Dr. Day's testimony was objectionable as containing hearsay because she "adopted and testified to" Dr. Bursch's 2007 evaluation. The Court would note, however, that Taylor has never produced any documentation to support her any of those allegations. Nor does she allege that she told defense counsel about Dr. Day having allegedly been "hired" by Taylor's DCF case attorney to evaluate her or about what Dr. Day supposedly reported at that time. Finally, Taylor's argument that Dr. Day's testimony contained was objectionable as hearsay, on the theory that she had adopted and testified to Dr. Bursch's 2007 report, is refuted by the record, as Dr. Day's testimony never mentioned either Dr. Bursch or any report by her.

72

with the CPT might suggest that she had a "conflict of interest" or might give rise to a basis to object to her testimony.[12] This claim is denied.

> d.    *Failure at Sentencing to Contest the Determination Regarding the Level of R.T.'s Injuries*

In Ground Eleven, Taylor argues that trial counsel was ineffective at sentencing in failing to contest the trial court's determination with respect to the level of seriousness of R.T.'s injuries. (Petition at 33-34; Reply at 8). Florida state court defendants are sentenced pursuant to the Criminal Punishment Code, see Fla. Stat. § 921.002; Rule 3.704, Fla. R. Crim. P., with points assigned for various categories on a sentencing worksheet. See id; Rules 3.704 and

---

[12] In raising this claim, Taylor seems to have perhaps relied on Rhue v. State, 603 So. 2d 613 (Fla. 2nd DCA 1992). There, the court of appeal concluded that a defendant might have been entitled to an evidentiary hearing on his "claim that defense counsel failed to reveal a potential conflict of interest," based on allegations that "both counsel and the state's psychologist witness were members of a child protection team organized to provide an integrated professional response to deal with the problems that arise when a child has alleged been sexually abuse by an adult." Id. at 615 (internal quotation marks omitted). Taylor has never cited Rhue, but her Rule 3.850 motion and the Petition both include language strikingly similar to that appearing in the opinion. However, any reliance by Taylor on Rhue is misplaced. The issue there was defense counsel's failure to reveal his or her own potential conflict of interest arising from the fact that counsel and the psychologist who testified as a prosecution witness were both allegedly members of the CPT. There was no issue related to whether the psychologist might have had a "conflict of interest" or whether his or her testimony might have been inadmissible based an affiliation with the CPT. And unlike the defendant in Rhue, Taylor has never alleged that her defense attorney was affiliated with the CPT or might have otherwise been laboring under a conflict of interest.

3.992(a), Fla. R. Crim. P.; Fla. Stat. § 921.0024. One of the categories is for "victim injury," which is "scored for physical injury or death suffered person as a direct result of any offense pending before the court for sentencing." Rule 3.704(d)(9), Fla. R. Crim. P. As relevant here, 4 points are assigned for "slight" injury, 18 points for "moderate," and 40 points for "severe." Fla. Stat. § 921.24; Rule 3.992(a); see also Surit-Garcias v. State, 391 So. 3d 921, 930-33 (Fla. 4th DCA 2024). The trial court scored R.T.'s injuries on Taylor's sentencing worksheet as "severe," without objection by defense counsel. (Doc. 8-1 at 135; Doc. 8-9 at 709-10). Taylor claims that trial counsel "was ineffective for failing to argue at sentencing that [R.T.'s] injury was changed from 'great' to 'severe' with no evidence to support [even] 'great' injury." (Petition at 33-34). Taylor contends this was error, "adding 40 points to [her] score sheet," because "[t]he jury was never asked to make a finding as to the degree of injury, [and] their instructions were incomplete and incorrect." (Id. at 33).

Taylor presented this claim to the state trial court in Ground Sixteen of her Rule 3.850 motion. (Doc. 8-9 at 43-44). The state trial court summarily denied relief, stating:

> Defendant contends counsel performed deficiently by failing to object during Defendant's sentencing to the State's contention that the victim injury in this case was "severe" as opposed to "great." Defendant alleges that, because the jurors never made a finding as

74

to the degree of victim injury, the classification of victim injury as "severe" was inappropriate. In fact, Defendant believes there was no injury, and alleges that, had counsel argued no victim injury had been proven, her sentence might have been different.

Though Defendant argues the jury did not make a finding regarding the degree of injury, the jurors did find Defendant guilty as charged in the Information of both Aggravated Child Abuse and Child Neglect. [Doc. 8-9 at 67-68]. By finding Defendant guilty as charged, the jurors necessarily found, as noted in the Information, that both the child abuse and child neglect caused "great bodily harm, permanent disfigurement, or permanent disability." [Id. at 697]. Such a finding of great bodily harm, permanent disfigurement, or permanent disability supports the assessment of victim injury points for severe injury. See Fleming v. State, 139 So. 3d 902, 903 (Fla. 1st DCA 2006). Counsel even acknowledged that he was respecting the jury's verdict by choosing not to argue the assessment of severe victim injury points. [Doc. 8-9 at 709-10]. As such, Defendant is not entitled to relief on Ground Sixteen.

(Doc. 8-9 at 62-63) (emphasis original).

The state court's decision rejecting this claim is not contrary to, or an unreasonable application of Strickland or other Supreme Court precedent, nor is it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). This claim also fails at a more basic level. While not discussed by the trial court's order on the Rule 3.850 motion or the State's Response, Taylor's appointed counsel for the direct appeal also filed a motion in the state trial court, before filing an appellate brief, seeking to correct a sentencing error pursuant to Rule 3.800(b)(2), Fla. R. Crim. P., raising as its sole claim that the

trial court's sentencing score for R.T.'s injuries as "severe" was not supported by the jury's verdict or sufficient evidence. (Doc. 8-4 at 5-10). The trial court summarily denied that motion on the merits. (Id. at 11-13). Because Taylor was able to have the substantive issue underlying this ineffective assistance claim heard on the Rule 3.800 motion, she suffered no prejudice under Strickland from counsel's failure to contest the issue at the sentencing hearing. See Deronville v. Warden, Fla. State Prison, No. 24-80148-CIV, 2024 WL 2258357, at *12 (S.D. Fla. May 14, 2024), certificate of appealability denied sub nom. Deronville v. Fla. SP Warden, No. 24-11991, 2024 WL 5125979 (11th Cir. Oct. 24, 2024). Habeas relief is denied on this claim.

### 4. Failure to Challenge Venue (Ground Twelve)

In Ground Twelve, Taylor argues that her trial counsel was ineffective because he "failed to argue that Duval County was not the correct venue to prosecute [her]." (Petition_at 36). Under Florida's criminal venue statute, prosecutions must generally be "tried in the county where the offense was committed." Fla. Stat. § 910.03(1). If the acts constituting an offense are committed in two or more counties, venue is proper in any of them. Fla. Stat. § 910.05. The State has the burden to prove venue. Dimanche v. Sec'y, Dep't of Corr., No. 6:11-CV-944-ORL-36, 2013 WL 2447950, at *5 (M.D. Fla. June 5,

2013) (citing <u>McClellion v. State</u>, 858 So. 3d 379, 381 (Fla. 4th DCA 2003). But "venue is not a jurisdictional prerequisite," nor is it an element of a charged crime, and it is sufficiently shown "if the jury can reasonably infer from the evidence that the crime was committed in the county in which the defendant was charged." <u>Id.</u> (quoting <u>McClellion</u>, <u>supra</u>).

Taylor claims that counsel should have argued that venue was proper not in Duval County but rather only in neighboring Baker County, where Taylor, her husband, and R.T. lived in Macclenny, Florida. (<u>See</u> Petition at 36-37). Taylor argues that, under the State's theory, that is where she would have supposedly poisoned R.T. By contrast, Taylor alleges, Duval County was just where the hospital where R.T. was taken for medical treatment. (<u>Id.</u> at 37-38). <u>See generally</u> <u>Pennick v. State</u>, 453 So. 2d 542, 544 (Fla. 3d DCA 1984) ("[E]vidence that the victim of the shooting was treated at a hospital located in Dade County hardly serves to prove the venue of the crime." (citing <u>Smith v. State</u>, 27 So. 868 (Fla. 1900)).

The State contends this claim is procedurally defaulted. (Response at 57). Taylor does not dispute that but argues that she can show cause and prejudice, <u>see</u> <u>Ward</u>, 592 F.3d at 1157. (<u>See</u> Petition at 38; <u>see also</u> Reply at 1-2). Namely, she asserts that this claim is meritorious and that she failed to

77

present it in state court because she was denied "adequate help" using the prison law library. (Petition at 38; see also Reply at 1-2; Doc. 11). She maintains that she "has no knowledge of the law and lacks the necessary skills to prepare any motion" (Petition at 38), and that, when she filed her Rule 3.850 motion, she "was unaware … that she could fight the issue[] of venue." (Reply at 9). The State replies that Taylor cannot establish cause or prejudice and that the claim thus remains procedurally defaulted. (Response at 58-60).

A prisoner does not have a constitutional right to appointed counsel in post-conviction proceedings. Coleman, 501 U.S. at 756–57. Nor do prisoners have "an abstract, freestanding right to a law library or legal assistance." Lewis v. Casey, 518 U.S. 343, 351 (1996); see also McCoy, 953 F.2d at 1258-59. Nevertheless, the Supreme Court recognized in Martinez that where a prisoner is not represented by counsel in an initial-review collateral proceeding in state court, that circumstance may constitute cause excusing a procedural default based on the failure to have raised a substantial claim of ineffective assistance of trial counsel where, by state court rules or practice, a collateral proceeding is the first practical opportunity to raise such a claim. 566 U.S. at 17; see also Trevino v. Thaler, 569 U.S. 413, 428-29 (2013). This rule may apply to claims brought by Florida state prisoners who, like Taylor, were did not have counsel

78

on motions for postconviction relief in state court, insofar as "Florida courts generally prohibit defendants from raising ineffective assistance of counsel claims on direct appeal." Raleigh v. Sec'y, Fla. Dep't of Corr., 827 F.3d 938, 957 (11th Cir. 2016).

The State fails to address the Martinez issue. Even so, Martinez might only excuse a procedural default of a claim alleging ineffective assistance of trial counsel that is "substantial," meaning it has at least "some merit." 566 U.S. at 14; see also Hittson v. GDCP Warden, 759 F.3d 1210, 1269 (11th Cir. 2014). Taylor cannot meet that standard. She would need to establish both deficient performance and prejudice under Strickland. See United States v. Greer, 440 F.3d 1267, 1271-72 (11th Cir. 2006). Although the State neglects to mention the fact, the record discloses that, at the close of the State's case, Taylor's counsel did, in fact, present a motion for judgment of acquittal claiming that the prosecution failed to prove venue in Duval County. (Doc. 8-2 at 500-01). The state trial court denied the motion, agreeing with the State's argument that the evidence at trial had been sufficient to allow the jury to find that at least some of Taylor's wrongful acts constituting aggravated child abuse and neglect of R.T. occurred at the hospital in Duval County. (Id. at 501-03). Such included circumstantial evidence that Taylor might have secretly

79

administered some iron supplements to R.T. while she was there and that, at a minimum, the evidence supported that Taylor had given hospital staff a false history for R.T., thereby causing her to undergo unnecessary, painful medical testing and interventions. (See id.)

Because the record refutes Taylor's assertion that counsel did not contest venue, she cannot show that counsel's performance was deficient or that she suffered prejudice. See Diaz v. United States, No. 18-10605-A, 2018 WL 11336780, at *2 (11th Cir. Apr. 19, 2018); Waiters v. United States, No. 8:19-CR-452-TPB-NHA, 2025 WL 2855357, at *3 (M.D. Fla. Oct. 8, 2025). As a result, this claim is not "substantial" for purposes of Martinez, and Taylor fails to overcome her procedural default, and the Court denies the claim on that basis. Alternatively, the claim is denied on the merits. See 28 U.S.C. § 2254(b)(2); LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1261 & n.26 (11th Cir. 2005).

**B. The Brady Claim**

In Ground Five and part of Ground Four, Taylor raises a claim under Brady v. Maryland, 373 U.S. 83 (1963). (Petition at 16-17, 19; see also Reply at 6-7). A Brady violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999). There is no suppression by the government if the defendant knew of the information or had equal access to obtaining it through the exercise of reasonable diligence. Parker v. Allen, 565 F.3d 1258, 1277 (11th Cir. 2009); Maharaj, 432 F.3d at 1315. "The prejudice or materiality requirement is satisfied if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Boyd v. Comm'r, Alabama Dep't of Corr., 697 F.3d 1320, 1334 (11th Cir. 2012) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

Taylor claims that the "State withheld [R.T.]'s medical records from the period of time after her Albumin infusion, showing the continuation of her documented medical issues." (Petition at 19). Again, Taylor's theory is that R.T.'s the elevated level of iron detected at the hospital was the product of the hospital's own administration of albumin, not by Taylor's having secretly given her iron supplements, as State posited. (*See* id.; see also id. at 7). Taylor claims this would have been shown by R.T.'s withheld medical records and thus

81

"disproved the State's claim that [Taylor] poisoned [R.T.] with iron, as [R.T.] was under the care of medical professionals in a hospital setting." (Id. at 19).

Taylor presented this claim in Ground Seven in her Rule 3.850 motion. (Doc. 8-9 at 40). The state trial court denied relief without an evidentiary hearing, stating as follows:

> Defendant contends a Brady violation occurred where the State failed to provide the victim's complete medical records. Defendant contends she advised counsel the medical records were incomplete and asked him to obtain the completed records, believing that the records would have showed the victim had elevated liver counts after her Albumin, Human (Buminate) infusion and would have acquitted Defendant.
>
> However, "[a] Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant," Geralds v. State, 111 So. 3d 778, 787 (Fla. 2010) (quoting Occhicone v. State, 768 So. 2d 1037, 1042 (Fla. 2000)). See also Pagan v. State, 29 So. 3d 938, 947-48 (Fla. 2009) ("If the evidence in question was known to the defense it cannot constitute Brady material."). Likewise, "[t]here is no Brady violation where, the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence." Provenzano v. State, 616 So. 2d 428, 430 (Fla. 1993) (citing Hegwood v. State, 575 So. 2d 170, 172 (Fla. 1991)).
>
> Thus, by alleging in her own Motion that she asked counsel to obtain these records, Defendant proves she knew of their existence and belies her claim of a Brady violation. As such, she is not entitled to relief on [this] Ground ….

(Doc. 8-9 at 63-64).

The state trial court's disposition is the last reasoned decision addressing this claim. See Wilson, 584 U.S. at 125. Taylor fails to show that court's denial on the merits is contrary to, or an unreasonable application of, Brady or its Supreme Court progeny, 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts, id., § 2254(d)(2). Taylor does not dispute that she was aware prior to trial of R.T.'s medical records she cites, which the defense could have itself obtained in the exercise of due diligence. Taylor has also never presented any additional medical records, either to the state court or this one, and "mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'" United States v. Jordan, 316 F.3d 1215, 1252 n.81 (11th Cir. 2003).

Indeed, it is also clear that Taylor cannot establish materiality because, as discussed in connection with Taylor's claims alleging ineffective assistance of counsel, the State's witnesses did, in fact, acknowledge in their testimony that R.T. was given an albumin infusion at the hospital for her liver dysfunction before the staff ran a toxicology screen and determined that her iron levels were elevated. Accordingly, there is not a reasonable probability that the medical records supposedly withheld, which would have been merely

83

cumulative of that testimony of the State's own witnesses, would have changed the outcome of Taylor's trial. See United States v. Brester, 786 F.3d 1335, 1339 (11th Cir. 2015). This claim is denied.

## C. Claims Based on Alleged Errors by the State Trial Court

Finally, the Court considers in turn Taylor's claims based on alleged errors by the state trial court, raised in Grounds Six, Thirteen, Fourteen, and Fifteen. In Grounds Six and Thirteen, Taylor contends that the trial court improperly admitted Williams Rule evidence of other bad acts (Petition at 21-22, 40-43). In Ground Fifteen, she raises a related claim that the trial court improperly allowed testimony over objection from four witnesses "used to bring in reports about [Taylor's] other children from other States." (Id. at 48-51). And in Ground Fourteen, Taylor maintains that the trial court erred in imposing "a vindictive sentence and … sex offender probation." (Id. at 45-46).

### 1.  Admission of Williams Rule Evidence

The Court has previously addressed a claim by Taylor alleging her counsel was ineffective in failing to raise certain arguments regarding that Wiliams Rule evidence that, consistent with her factitious disorder diagnosis, Taylor had abused and neglected her other children. Within Ground Six and Ground Thirteen, Taylor also raises a substantive claim that the state trial

84

court erred by admitting such evidence. (Petition at 21-22, 40-43; see also Reply at 6-7). In support, she argues that evidence was "prejudicial," was used "to show [her] in a bad light," and "allowed the jury to infer guilt of previous collateral crimes where there was never any proof nor charges that there was a crime." (Petition at 22). That substantive claim is distinct from the Sixth Amendment claim. See Kimmelman v. Morrison, 477 U.S. 365, 374 (1986); LeCroy, 421 F.3d at 1260.

However, Federal habeas relief lies only for violations of the Constitution or laws or treaties of the United States, not for errors of state law. Swarthout v. Cooke, 562 U.S. 216, 219 (2011). Accordingly, a claim asserting that evidence was admitted in violation of the Williams Rule or the state rule of evidence codifying it, Fla. Stat. § 90.404, cannot support habeas relief. See McGee v. Inch, No. 1:19-CV-23934, 2021 WL 602587, at *7 (S.D. Fla. Feb. 16, 2021), aff'd sub nom. McGee v. Sec'y, Dep't of Corr., No. 21-10710, 2022 WL 2315083 (11th Cir. June 28, 2022). The "Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" against the introduction of evidence 'that is so unduly prejudicial that it renders the trial fundamentally unfair.'" Andrew v. White, 604 U.S. 86, 92–93 (2025) (quoting Payne v. Tennessee, 501 U.S. 808, 825 (1991)); see also Kanas v. Carr, 577 U.S. 108, 123 (2016). However, in

85

presenting this substantive claim, neither Taylor's Petition nor her Reply mentions due process, the Fourteenth Amendment, the Constitution, any federal law or standard, or any federal caselaw. (Petition at 21-22, 40-43; Reply at 6-7). The claim is thus due to be denied because Taylor has not pled or argued it as implicating a violation of federal law. See Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982) ("If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.").

But even assuming to the contrary, Taylor would have also had to exhaust the claim in the Florida state courts, including by sufficiently identifying it as one arising under the United States Constitution. See Baldwin v. Reese, 541 U.S. 27, 29 (2004); Duncan v. Henry, 513 U.S. 364, 366 (1995). Taylor did raise her substantive Williams Rule claim as the sole ground of her direct appeal, but she relied only Florida state law and Florida state appellate court cases. (See Doc. 8-5 at 4, 19-26; Doc. 8-7 at 4-7). Therefore, she "did not apprise the state court of [her] claim that the evidentiary ruling[s] of which she complained [were] not only a violation of state law, but denied [her] the due process of law guaranteed by the Fourteenth Amendment." Henry, 513 U.S. at 366. Accordingly, even assuming Taylor sufficiently alleged this as a federal claim in this Court, the claim is denied as unexhausted and procedurally

86

defaulted. Id.; Fortune v. Sec'y, Dep't of Corr., No. 18-13813-E, 2019 WL 1163849, at *2 (11th Cir. Feb. 12, 2019); Gonzalez-Garcia v. Sec'y, Fla. Dep't of Corr., No. 8:23-CV-397-TPB-CPT, 2026 WL 262595, at *9 (M.D. Fla. Feb. 2, 2026).

Finally, even assuming further that Taylor sufficiently presented this claim in the state courts as arising under federal law, it would still fail. If Taylor were given the benefit of the doubt that she presented this as a federal claim in the state courts despite the lack of citation to federal authority, it is only reasonable that the state courts should be likewise regarded as having decided the claim. Accordingly, the state courts' rejection of the claim is entitled to deference under § 2254(d). The proposition that Due Process Clause of the Fourteenth Amendment may be violated by the admission of evidence that renders the trial "fundamentally unfair" is clearly established federal law for purposes of § 2254(d). Andrew, 604 U.S. at 92-93. However, "[b]ecause AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that 'the more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges— 'the more leeway state courts have in reaching outcomes in case-by-case determinations.'" Renico v. Lett, 559 U.S. 766, 776 (2010) (quoting Yarborough

v. Alvarado, 541 U.S. 652, 664 (2004) (alterations adopted)). In that regard, the basic "unfairness" standard used to measure alleged due process violations arising from improper arguments or evidence at trial could hardly be more general. See Parker v. Matthews, 567 U.S. 37, 48 (2012); Lucas v. Warden, Georgia Diagnostic & Classification Prison, 771 F.3d 785, 805 (11th Cir. 2014). And no Supreme Court precedent clearly established that the admission of evidence regarding Taylor's diagnosis of factitious disorder and her associated prior mistreatment of her other children as proof of motive violated the United States Constitution. See McGee, 2021 WL 602587, at *7. Habeas relief is denied on these claims.

### 2. Admission of Witness Testimony

In Ground Fifteen, Taylor similarly claims that the trial court erred by admitting "prejudicial" testimony from four witnesses who "issued extensive reports … using medical and DCF records for [Taylor's] older children in 2 other states that were not a party to this case, relying on reports written by Brenda Bursch Ph.D., a psychologist used in Arizona by DCF who has followed … and stalked [Taylor] through four states over 20 years." (Petition at 48). Taylor identifies the witnesses who provided such improper testimony as: (1) Dr. Deborah Day, a psychologist previously referenced in connection with one

88

of the ineffective assistance claims; (2) Brenda Farrera, R.T.'s foster parent who later adopted her; (3) Nurse Practitioner Sandy Shapiro, who worked with the CPT; and (4) Dr. Debra Esernio-Jenssen, a pediatrician who also worked with he CPT. (Petition at 48-51). Taylor argues that, because these witnesses relied on medical records and various reports, including from Dr. Bursch, the reports and testimony of these four witnesses was "hearsay at best and violate[d Taylor's] Sixth and Fourteenth Amendment rights." (Id. at 48).

The State argues that these claims are unexhausted and procedurally defaulted. (Response at 66-67). Taylor concedes that she did not exhaust these claims, but she tries to overcome her procedural default by arguing cause and prejudice. (Petition at 52). To support her claim of cause, she again alleges that she was denied "adequate help" by staff in using the prison law library. (Id.) However, prisoners do not have "an abstract, freestanding right to a law library or legal assistance." Casey, 518 U.S. at 351. Neither Taylor's lack of legal knowledge or training nor the failure of staff to assist her in using the law library qualifies as cause for default of alleged substantive trial errors. See McCoy, 953 F.2d at 1258-59. Moreover, Taylor fails to explain why she did not timely raise these claims on direct appeal, when she was represented by counsel; include them in her first Rule 3.800 motion, when she was also so

89

represented; or include them in her Rule 3.850 motion. Because Taylor cannot establish cause, she fails to overcome her procedural default. Habeas relief on these claims is denied.

### 3. Vindictive Sentence and Sex-Offender Probation

Finally, in Ground Fourteen, Taylor claims that the trial court erred by imposing "a vendictive (sic) sentence and … sex offender probation." (Petition at 45-46; see also Reply at 9). She first argues that the trial court sentenced her to 12 years imprisonment "for what the Court believed … [Taylor] did to her other children in other States that she was never prosecuted for and that were not a party to this case." (Id.) Taylor also alleges that she improperly received "15 years of Sex Offender Probation," even though she "has never been even accused of a sex offense." (Id. at 46).

The State argues that these claims are also procedurally defaulted. Taylor admits she did not present these claims in state court prior to filing her federal habeas Petition. (Petition at 46-47). On March 1, 2023, about a week after filing the Petition, Taylor filed a motion in the state trial court seeking relief under Rule 3.800(a), Fla. R. Crim. P., based on a claim that is in substance similar to her "sex offender probation" claim. (Doc. 8-13). On August 24, 2024, she filed an amended motion that added a claim that is in substance

90

her "vindictive sentencing" claim. On September 4, 2024, the state trial court summarily denied relief, concluding that neither claim was cognizable in a motion under Rule 3.800(a). On April 5, 2025, the Fifth DCA affirmed without a reasoned opinion. The Florida state courts thus deemed these claims procedurally barred under state law. And because it too late to raise the claims in state court, they are procedurally defaulted on habeas review.

Taylor tries to overcome the default, arguing that she can show cause and prejudice. (Petition at 46-47). To support her claim of cause, she again alleges that she was denied "adequate help" by staff in using the prison law library. (Id.) However, as explained previously, such does not qualify as cause for default of her claims based on alleged substantive errors by the trial court. Taylor also fails to explain why she did not timely raise these claims at trial and on direct appeal, when she was represented by counsel; included them in her first Rule 3.800 motion, when she was also so represented; or include them in her Rule 3.850 motion. Because Taylor cannot establish cause, she fails to overcome her procedural default.

Alternatively, the claims are denied on the merits. Federal habeas relief is available only to redress violations of federal law, not state law. Cooke, 562 U.S. at 219. However, Ground Fourteen does not reference any provision of the

91

United States Constitution or any judicial decisions, federal or otherwise. Therefore, these claims as pleaded are not cognizable in federal habeas. See Isaac, 456 U.S. at 120 n.19. These claims are denied.

To the extent that the Petition contains additional claims not specifically discussed herein, they are denied as procedurally defaulted or, alternatively, on the merits.

### VI. Certificate of Appealability
### Pursuant to 28 U.S.C. § 2253(c)(1)

If Taylor seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Taylor "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

92

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.    The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.    If Taylor appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending

93

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 30th day of March, 2026.

HARVEY E. SCHLESINGER
United States District Judge